**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| BOARD OF COMMISSIONERS FOR DOUGLAS COUNTY, COLORADO,<br><br>                   Plaintiff,<br><br>v.<br><br>CROWN CASTLE USA, INC. and T-MOBILE WEST LLC,<br><br>                   Defendants. | Civil Action No. 17-cv-03171-RM-MJW |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Facilitating the deployment of wireless facilities is a national priority. Central to that objective is the modernization of existing wireless facilities, which must be done routinely as technology advances, additional radiofrequency spectrum is put into use, and network needs change. Such modifications are often far less obtrusive than building new facilities. In 2012, recognizing that local jurisdictions were unreasonably delaying wireless technology upgrades, Congress enacted Section 6409(a) of the Middle Class Tax Relief and Job Creation Act, which mandates that local jurisdictions may not deny, and shall approve, eligible facilities requests ("EFRs")—i.e., those requests that do not result in a substantial change to the physical dimensions of an existing facility. In 2014, the Federal Communications Commission ("FCC")—the agency charged with implementing Section 6409—defined "substantial change," set out a series of timing requirements, and determined that an EFR not acted upon by the deadline is deemed granted.

In 2017, Crown Castle and T-Mobile ("Applicants") submitted precisely the type of request envisioned by Section 6409: an application to modify an existing facility located in rural Douglas County (the "Application"). In seeking to add just one foot to the overall height and less than two

1

feet to the diameter of the facility, Applicants were well within the EFR size limits established by the FCC. The County refused to act on the Application, claiming that the increase in size defeated the "concealment elements" of the existing pole, despite the fact that Applicants proposed retaining the shroud that fully conceals the antennas from view. Ultimately, pursuant to federal law, T-Mobile was forced to send a "deemed grant" letter in December, which the County then challenged in this Court. In addition to arguing the Application was not an EFR, the County now takes the position that it *did* deny the Application, back in June 2017, and therefore Applicants' December deemed grant letter was untimely. The County is either trying to rewrite history, or it intentionally tried to put the Applicants in limbo, depriving Applicants of the right to seek review but nevertheless subjecting them to a ticking clock that the County could later invoke to claim Applicants had waived their rights. Either way, the County's conduct should not be rewarded.

The record shows that Applicants' submission was an EFR, Applicants properly exercised their right to a deemed grant of that EFR, the County has deprived Applicants of a federal right in violation of 42 U.S.C. § 1983, and Plaintiff's conduct prohibits the provision of wireless services in violation of federal law. Defendants are entitled to a declaration that the deemed grant is effective, an injunction to enable construction, and reasonable costs and attorney's fees.[1]

## BACKGROUND

Crown Castle and T-Mobile are in the business of providing wireless telecommunications service. As part of its nationwide network, T-Mobile operates wireless facilities at a site in rural

---

[1] As discussed below, the parties have briefed a number of these issues in pending motions to dismiss and for judgment on the pleadings. Now that discovery has closed, Defendants submit this Motion for Summary Judgment in accordance with the court's scheduling order. The parties conferred on November 1, 2018 regarding this Motion but were unable to reach agreement.

Douglas County, Colorado, and Crown Castle manages the site. Statement of Facts ¶¶ 4, 9 ("SOF"). The site consists a 35' monopole of a stealth design, meaning that the wireless equipment is contained within a canister and therefore shrouded from view. *Id*. ¶¶ 5-7.

Applicants submitted an EFR Application on April 27, 2017 pursuant to an EFR-specific process established by the County's Planning Services department. SOF ¶¶ 10-12. On May 4, 2017, Planning Services staff acknowledged receipt of the EFR application and provided a copy of the original Site Improvement Plan so that Applicants could show the proposed changes. *Id*. ¶ 14. On May 18, 2017, Applicants returned a redline of the Site Improvement Plan provided to Applicants by the County, the last item submitted in support of the Application. *Id*. ¶¶ 13-15.

On June 22, 2017, the Applicants met with Planning Services staff to discuss the Application, a meeting that was memorialized in a memorandum ("June 29 Memorandum"). SOF ¶ 16. The June 29 Memorandum stated the staff's positions that "[t]he County's design standards for personal wireless communication facilities do not support a 38 [inch] canister or pole diameter for this site," that "[a]n expansion to 38 [inches] no longer provides a stealth design," and that "the canister diameter should not be significantly different from that of the pole itself." *Id*. ¶ 17. The Memorandum further stated that the Applicants' "proposed design [for the modification] does not meet the approval standards" in the County's regulations, "recommend[ed] that [the Applicants] consider alternative designs or locations that can accommodate the increased antennas and other equipment in a stealth manner," and advised the Applicants to prepare a subsequent submittal that "address[ed] the comments from this Presubmittal Review." *Id*.

Importantly, the County regulations referred to in the June 29 Memorandum do not define "concealment elements" or set specific criteria for stealth monopoles, and neither the regulations

nor the Memorandum refer to "concealment elements," "eligible facilities requests," Section 6409, or the FCC's implementing regulations.  SOF ¶¶ 18-19.  The June 29 Memorandum did not contain any language indicating that the County was denying the Application, and the County has been careful in this litigation not to characterize the Memorandum as a denial.  *Id*. ¶ 20-21.

On October 24, 2017, T-Mobile submitted a letter ("Oct. 24 Letter") responding to the County's concerns. SOF ¶ 22.  The letter stated that because the modification requested in the Application would neither effect "a substantial change" nor "defeat the concealment elements" of the structure, as those terms are defined by federal law, the Application was an EFR that by law must be granted within the timeframe ("shot clock") established by the FCC.  *Id*.  The letter further advised the County that "in the interest of finding a good faith resolution of this dispute, T-Mobile is treating [the County's request for a subsequent submittal at the June 22 meeting] as timely made" for purposes of the FCC's shot clock for EFR processing, and that the October 24 Letter restarted the shot clock, which began when the Application was complete (May 18, 2017), and was tolled beginning on the date the County requested a subsequent submittal (June 22, 2017).  *Id*. ¶ 23.

The County responded to the Oct. 24 Letter by asserting that there was no active application pending, to which T-Mobile responded in a letter in disagreement. SOF ¶¶ 24-25.  T-Mobile then issued a final letter on December 1, 2017 stating that, "pursuant to [Section 6409] and [FCC rules,] the Eligible Facilities Request application submitted to Douglas County, Colorado on May 18, 2017 . . . is now **DEEMED GRANTED**."  *Id*. ¶ 26.  The letter advised the County that the proper recourse to contest the deemed grant was to challenge it in a court of competent jurisdiction.  *Id*.

The County brought this action to challenge the deemed grant, and Applicants counterclaimed, seeking to enforce it.  Specifically, Applicants sought (i) a declaratory judgment

that the Application is deemed granted and that Applications may begin construction, (ii) injunctive relief to enable that construction, and (iii) costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988.  The County moved to dismiss Applicants' claim for fees, and the parties briefed that issue.  As the motion to dismiss remained pending and the discovery period continued, Applicants' request remained un-granted, and Applicants were unable to make the modifications necessary to improve its wireless service and expand T-Mobile's use of FCC-licensed frequencies. Both parties having pled on the issues of whether the Application was an EFR and whether Applicants had properly exercised a deemed grant remedy, Applicants filed a Motion for Judgment on the Pleadings to facilitate resolution of the central dispute.  All briefing on this motion has been completed, and both parties' motions remain pending.

Although the Court has scheduled a hearing on the pending motions, the Court's order did not affect the summary judgment motion deadline.  Discovery has concluded, and Defendants' positions continue to be correct.  Accordingly, Defendants now move for summary judgment.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A reviewing court "must view the evidence in the light most favorable to the [opposing] party," but "the moving party's initial burden is slight," requiring only that the movant "allege an absence of evidence to support the opposing party's case and identify supporting portions of the record."  *Evans v. Bd. of Cty. Comm'rs*, 752 F. Supp. 973, 975 (D. Colo. 1990).  In response, the nonmovant bears the burden of establishing genuine issues of material fact; mere "[c]onclusory allegations will not establish an issue of fact sufficient to defeat summary judgment."  *Id*.

5

**ARGUMENT**

The Applicants' claims must succeed because: (i) under federal law, Applicants' request was an EFR that the County was required to grant; (ii) Applicants' properly exercised the deemed granted remedy that federal law affords EFRs; (iii) Plaintiff has deprived Applicants of a federal right in violation of Section 1983; and (iv) Plaintiff's conduct has the effect of prohibiting the provision of wireless services in violation of federal law. Defendants have articulated the legal arguments supporting the first three points at length in its opposition to Plaintiff's Motion to Dismiss Defendants' Section 1983 count and Defendants' subsequent Motion for Judgment on the Pleadings, and discovery has not altered the analyses. For ease of the Court's reference, and in light of the different standard of review at the summary judgment stage, Defendants recount these legal arguments briefly below, as well as provide the legal basis for unlawful prohibition of service.

**I. APPLICANTS' REQUEST WAS AN EFR THAT PLAINTIFF WAS REQUIRED TO GRANT UNDER FEDERAL LAW**

Section 6409 provides that "a State or local government may not deny, and shall approve, any eligible facilities request for a modification of an existing wireless tower or base station that does not substantially change the physical dimensions of such tower or base station." 47 U.S.C. § 1455(a)(1). Under the FCC's rules, a proposed modification "substantially changes the physical dimensions" of the tower if it adds more than 10 percent or more than 10 feet to the height (whichever is greater) or adds an appurtenance larger than 20 feet, or if "[i]t would defeat the concealment elements of the eligible support structure." 47 C.F.R. § 1.40001(b)(7)(i), (v).

The site at issue is a 35-foot-tall pole with a canister shroud concealing the wireless equipment at the top. The Application proposed adding one foot to the overall height of the pole and increasing the diameter of the canister shroud by 20 inches. SOF ¶ 11. Although both

dimensions are well within the limits prescribed by the FCC for EFRs, Plaintiff maintains that it was not required to grant the Application because the proposed changes defeat concealment elements associated with the pole. But this is incorrect. In its *2014 Infrastructure Order,* the FCC explained that for "concealed or 'stealth'-designed facilities— i.e., facilities designed to look like some feature other than a wireless tower or base station," modifications that would undermine the structure's "concealment elements . . . such as painting to match the supporting façade or artificial tree branches, should be considered substantial." 29 F.C.C.R. 12865, 12950, ¶ 200 (2014) ("*2014 Order*"). The proposed changes do not impact the "concealment elements," as a matter of law.

Although the County argues that the pole at issue is a "stealth wireless communications facility" that was "specifically intended to look like other utility poles in the area," and that the initial Site Improvement Plan "was approved because of the concealment elements of the structure's design," Compl. ¶¶ 48-49 (Doc. 1), the uncontested facts belie these assertions. The Site Improvement Plan does not specify that the facility is intended "to look like other utility poles in the area," nor does it explicitly reference any "concealment elements" as prerequisites for approval. The Plan includes only two potential "concealment elements" (concealment of antennas within a canister and the color of the pole, SOF ¶ 7), both of which were retained in the Application.

Nor do County regulations establish concealment elements of the type Plaintiff now identifies. The County's Design Standards merely assert vague principles for integrating facilities into the surrounding environment, and do not require that a pole be a particular diameter or even a particular shape. SOF ¶ 18; Ex. E § 2703A.01 (requiring that facilities be "architecturally and visually (color, bulk, mass, size) compatible with surrounding existing buildings"). In fact, to the extent the Design Standards mention "stealth or faux structures," the examples given ("windmills,

7

silos and light standards") *do not* include the facility at issue here. Compl. ¶ 46.

In the County's view, localities should be able to unilaterally (and retroactively) designate which aspects of a facility's design are "concealment elements," and should also have the subjective discretion to determine when an otherwise-permissible change in size renders a pole insufficiently pole-like. But a subjective standard of this kind, leaving localities with nearly complete discretion to reject modifications regardless of size and scope, is completely inconsistent with the *2014 Order*. There, the FCC adopted a test "defined by specific, objective factors rather than the contextual and entirely subjective standard advocated" by some commenters,[2] noting that an objective approach was consistent with "the overwhelming majority of State collocation statutes adopted since the passage" of Section 6409. *2014 Order* ¶ 190. If jurisdictions could construe concealment elements as including the particular size and shape of every facility, municipalities could completely circumvent the objective size limits that the FCC imposed.

## II.    APPLICANTS PROPERLY EXERCISED THE DEEMED GRANT REMEDY

### A.    Applicants' EFR Was Deemed Granted on December 1, 2017.

To meet Section 6409(a)'s objectives to "reduc[e] delays in the review process" and "facilitat[e] the rapid deployment of wireless infrastructure," *2014 Order* ¶ 15, FCC rules require localities to approve an EFR application within 60 days. 47 C.F.R. § 1.40001(c)(2). The shot clock may also be tolled by "mutual agreement," which is not required to be in writing. *Id*. § 1.40001(c)(3). If a local government "fails to approve or deny" an EFR within the shot clock, as

---

[2]    The FCC's decision to impose an objective test was based in part on the facts that (a) Congress "took care to refer" to measurable "physical dimensions," rather than a more subjective set of criteria, (b) Congress intended the review of these facilities to take place in a timely fashion, and (c) "disputes arising from a subjective approach would tend to require longer and more costly litigation to resolve." *2014 Order* ¶ 189.

adjusted by any tolling, "the request shall be deemed granted." *Id*. § 1.40001(c)(4). A deemed grant is effective when the "applicant notifies the applicable reviewing authority in writing." *Id*.

The present case followed exactly the trajectory envisioned by the FCC. The Applicants submitted a complete EFR on May 18, 2017, starting the 60-day review period. Applicants met with Planning Staff on June 22. Because the Applicants believed that through further collaboration the parties could "resolve their differences" without resorting to litigation, *2014 Order,* ¶ 236, the Applicants treated the June 22 meeting as a request that tolled the shot clock. SOF ¶ 23. On October 24, the Applicants provided additional information to resolve the County's doubts as to whether it was legally required to grant the Application, thereby restarting the shot clock. *Id*. The County did not request any further information within 10 days and, accordingly, when the County neither granted nor denied the Application by November 18, the shot clock expired and Applicants were entitled to a deemed grant. On December 1, 2017, the Applicants notified the County via letter that the Application was deemed granted as of that date.

### B. The Deemed Grant Is Effective, and Applicants Are Entitled to Enforce It.

The County argues that even if the Application is an EFR, the Applicants' deemed grant is "void." This is incorrect. First, the County claims that the June 29 Memorandum denied the Application, and accordingly the deemed grant is not subject to challenge because the Applicants did not bring suit within 30 days. Compl. ¶¶ 68, 85. Yet nowhere in the Memorandum does the County state either that it was denying the Application or that the County did not consider the Application to be an EFR. In fact, the Memorandum does not use any version of the terms "deny," "EFR," "substantial change," or "concealment element," nor does it cite Section 6409 or the Commission's implementing rules. SOF ¶¶ 19-20. Instead, the Memorandum "recommend[s] that

[Applicants] consider alternative designs or locations that can accommodate the increased antennas and other equipment in a stealth manner," and invites a further submittal to "address the comments from this Presubmittal Review." *Id*. ¶ 17.

The Applicants did not consider this document to be a denial or a final determination that the request was not an EFR, and neither should this Court. The Memorandum uses no language that would indicate it was a denial, and its direction to submit supplemental information supports that it was not. Indeed, had the Applicants gone to court on the basis of the Memorandum in mid-2017, the County would have undoubtedly argued that the claim was not ripe. Moreover, just as "a contract should be construed most strongly against the drafter," *United States v. Seckinger*, 397 U.S. 203, 210 (1970), any ambiguity about the meaning of the Memorandum should be resolved against the County, particularly given both the strong policy interest in ensuring clarity of government action that triggers rights, *see, e.g., Athens Cellular, Inc. v. Oconee Cty.,* 886 F.3d 1094, 1100 (11th Cir 2018) (noting that where there is a right of judicial review, local jurisdictions may not burden that right by failing to provide clear notice), and the "Federal interest reflected in Section 6409(a)" to "expedite personal wireless service facilities siting." *2014 Order,* ¶¶ 236, 243.

Finally, even if the Memorandum could properly be read as a denial, that Applicants were not obligated to bring a claim within 30 days. Although the FCC said that it sees "no reason why" claims "cannot and should not be brought within 30 days" of a denial, it did not impose regulations to this effect, instead leaving "enforcement of such claims" to the courts. *2014 Order,* ¶ 236. The circumstances here—where Applicants reasonably believed the County's Memorandum was not a denial and that the dispute could still be resolved without litigation—are entirely consistent with the FCC's expectation that Section 6409(a) claims be commenced "expeditiously." *Id.*

Second, and in the alternative, the County asserts that even if the June 29 Memorandum was not a denial, the 60-day processing timeline expired on July 17, 2017, and Applicants were obligated to send a deemed grant letter within 30 days of that date. As discussed above, the 60-day processing period was tolled following the June 22 meeting. But even if there was no tolling whatsoever, *nowhere* does the Commission require that a deemed grant letter be sent within 30 days. The FCC requires only that it be sent "after the review period has expired." 47 C.F.R. § 1.40001(c)(4). The *2014 Order*'s reference to taking action within 30 days of the "relevant event," ¶ 236, pertains to the commencement of suit, not the provision of a deemed grant notice.

## III. APPLICANTS ARE ENTITLED TO REASONABLE COSTS AND ATTORNEY'S FEES

Section 1983 imposes liability for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by anyone acting "under color of any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983. 42 U.S.C. § 1988 ("Section 1988") provides that "[i]n any action or proceeding to enforce a provision of" various statutes, including Section 1983, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs," including "expert fees." 42 U.S.C. § 1988(b), (c). By refusing to act on the Application proposing modifications that federal law provides the County "may not deny, and shall approve," Plaintiff has deprived Applicants of a federal right. Given the considerable delay caused by Plaintiff's actions and the strong federal policy interests against these kinds of delays, the court should award Defendants reasonable attorney's fees.

### A. Section 1983 Is Available for Violations of Section 6409.

As the Supreme Court has explained, Section 1983 is "available to enforce violations of federal statutes by agents of the State." *Wright v. City of Roanoke Redevelopment & Hous. Auth.*,

479 U.S. 418, 423 (1987). This general rule is subject to two exceptions: (1) "where the statute did not create enforceable rights, privileges, or immunities within the meaning of § 1983"; and (2) "where Congress has foreclosed such enforcement of the statute in the enactment itself." *Id.* Neither exception is applicable here. Section 6409 plainly creates an individually enforceable right: it expressly provides that localities "may not deny, and shall approve" eligible wireless facility modification requests, thus granting the creator of such a request the right to make the requested modification. Indeed, if such a right did not exist, the FCC would have lacked the authority to create regulations enforcing that right, which were challenged and upheld by the Fourth Circuit. *Montgomery Cty., Md. v. FCC*, 811 F.3d 121 (4th Cir. 2015).

Nor has Congress foreclosed Section 1983 relief. Such foreclosure can take two forms: express foreclosure in the statute, or the creation of a "comprehensive enforcement scheme that is incompatible with individual enforcement actions." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 297 (2002) (quotation and citation omitted). Congress did not create a comprehensive enforcement scheme in Section 6409; indeed, it did not create an enforcement scheme at all. *See, e.g., Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 109 (1989) (Section 1983 was available where statute was silent as to enforcement mechanism for "preventing state interference with federally protected labor rights"). That the FCC created an enforcement mechanism in its regulations does not change the analysis, because the FCC's conclusion that Section 6409 authorizes a specific remedy does not mean that it forecloses others. The Supreme Court's decision in *City of Rancho Palos Verdes* confirms this analysis. There, the Court held that Section 332(c)(7)(B)(v), a separate provision of the Communications Act unrelated to Section 6409, contained an enforcement scheme sufficient to foreclose Section 1983. *City of Rancho Palos*

*Verdes, Cal. v. Abrams*, 544 U.S. 113, 120 (2005).  Unlike Section 6409, however, Section 332 *contained an enforcement mechanism*, requiring applicants to seek judicial review of (non-EFR) zoning decisions within 30 days after final action by a locality.  *See id.*  Congress passed Section 6409 sixteen years after Section 332 and seven years after *City of Rancho Palos Verdes*.  It was well aware of how to create a comprehensive enforcement mechanism, and declined to do so here.

**B.      Plaintiff Has Deprived Defendants of a Federal Right in Violation of Section 1983.**

A local government is liable under Section 1983 when "execution of [that] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," causes the deprivation of a federal right.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  Official government policy includes the acts, including a single act, of final policymaking officials.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986); *Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1285 (10th Cir. 2007).  The Tenth Circuit outlines three factors to consider when determining whether an official is a final policymaker: "(1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decision are final—i.e., are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority."  *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995).  Applying these three factors to the uncontroverted facts confirms that the staff of Planning Services are final policymakers for the purpose of acting on EFR applications, and accordingly that their failure to act on the Application has deprived Defendants of a federal right.

First, the Planning Services staff was not meaningfully constrained by extrinsic policies.  The Planning Services' staff indisputably acted pursuant to its own policies with regard to EFRs,

without any constraints imposed by other decisionmakers in the County. Nothing in the County's zoning regulations addresses EFRs, SOF ¶ 18, and the County has offered no other legal argument demonstrating that how Planning Services staff handles EFRs is governed or constrained by some extrinsically developed law or policy. Rather the County admitted in its Complaint that, "[t]he County's Department of Community Development—Planning Services Division ("Planning Services") has an abbreviated application process ("EFR Process") for telecommunications applicants proposing collocation, removal or replacement of transmission equipment on existing approved cellular towers and base stations under Section 6409(a)." SOF ¶ 27. Moreover, the Planning Services' EFR policy appears only on its eligible facilities request form—it is not in the Zoning Resolution or any other County ordinance. SOF ¶ 28. That form makes no reference to the Zoning Resolution or *any* local law constraining Planning Services' review. SOF ¶ 29.

Because Planning Services staff acted pursuant to their own procedures and involved no other County officials or employees, they were not meaningfully constrained by extrinsic policies. *See Vogt v. City of Hays, Kansas*, 844 F.3d 1235, 1250–52 (10th Cir.), *cert. granted sub nom. City of Hays, Kan. v. Vogt*, 138 S. Ct. 55 (2017), and *cert. dismissed as improvidently granted sub nom. City of Hays, Kans. v. Vogt*, 138 S. Ct. 1683 (2018) (refusing to dismiss "final policymaker" theory where "there is nothing in the municipal ordinances suggesting that [another policymaker] plays a meaningful role in disciplinary decisions within the police department"); *Dill v. City of Edmond, Okl.*, 155 F.3d 1193, 1211 (10th Cir. 1998) (police chief was final policymaker when plaintiff's "transfer occurred pursuant to a policy adopted by" the police chief); *Brown v. Whitman*, 651 F. Supp. 2d 1216, 1232 (D. Colo. 2009) (finding that the "best evidence of the identity of the final policymaker" was the author of the relevant policy). Although the County Zoning Ordinance

has standards governing "personal wireless communication facility design standards," SOF ¶ 18, they say nothing about EFRs. As discussed above, per federal law, EFRs are to be treated differently than ordinary wireless siting applications. Accordingly, the County's general wireless facility standards do not have any bearing on this analysis. *See Flanagan v. Munger*, 890 F.2d 1557, 1568–69 (10th Cir. 1989) (contrasting city manager's *general* management and supervision over the police department with police chief's *direct* authority over the matter at issue, and finding chief to be final policymaker).

Second, Planning Services' actions with respect to the Application were final. Because Section 6409 mandates local approval of EFRs, a locality can deprive an applicant of its federal right to make eligible modifications either by denying the application, or, as happened here, by failing to take action on the application within the FCC-established timeframe. 47 C.F.R. § 1.400001(c)(2); *2014 Order* ¶ 214 (explaining that without a mandatory shot clock, "a State or local government could evade its statutory obligation to approve covered applications by simply failing to act on them"). Because Planning Services' failure to grant or deny the application within the shot clock triggered the deemed grant, this conduct is necessarily final.

Planning Services' actions were not subject to meaningful review. Douglas County alleges that Planning Services are not final policymakers because, as a general matter, staff decisions are appealable to the Board of Adjustment under Colorado law. County's MTD at 6 (Doc. 30). Even assuming that Planning Services' failure to act was appealable to the Board of Adjustment, Plaintiff's argument is untenable given the requirements of Section 6409. The Application was deemed granted when Section 6409's shot clock expired. Therefore, additional procedure after that expiration—such as an appeal to the Board of Adjustment—would violate Section 6409.

Because the County's purported review process is not possible under Section 6409, it cannot constitute meaningful review.  *See Randle*, 69 F.3d at 449 (declaring that review must be "*meaningful*—as opposed to merely hypothetical." (emphasis in original)); *see also Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1293 (11th Cir. 2004) (no meaningful review where "appellate process…was theoretically available on paper," but unavailable "as a practical matter").

Even if Planning Services could be considered to have denied the Application in the June 29 Memorandum, it cannot be that this was a "non-final" determination.  The County took the position in its Complaint that the Memorandum triggered Defendants' obligation to "challenge the County's determination" by "commencing an action in a court of competent jurisdiction," SOF ¶ 30, a position that is irreconcilable with the County's assertions now that Planning Services is unauthorized to render final decisions.  Moreover, a mandatory internal appeal would suffer from the same infirmity as requiring such an appeal after a failure to act: applicants would be unable to secure a decision within the 60-day timeframe mandated by federal law.  The Board of Adjustment appeals process itself takes *at least* 30 days to complete.  *See* Douglas Cty., Colo., Guide to Appeals, https://www.douglas.co.us/documents/appeals-information-packet.pdf (last visited Oct. 30, 2018).  Under federal law, Douglas County and other local jurisdictions have 30 days to review an application for completeness. 47 C.F.R. § 1.400001(c)(3)(i).  Thus, even if Douglas County had provided a mechanism for appealing Section 6409 decisions to the Board of Adjustment—which it did not, SOF ¶ 31—the appeal process would have to be initiated on the day the *initial completeness review* finished (i.e., well before even an initial decision is required) in order to have any chance of finishing within the prescribed 60-day limit.  Here, Planning Services issued its Memorandum 42 days after submission of the Application, making it impossible for the appeal

process to have concluded before expiration of the shot clock. Planning Services' determinations must be final or the EFR process violates Section 6409.

Third, Planning Services acted within the scope of its authority when it failed to approve Applicants' eligible facilities request. As discussed above, Douglas County authorized Planning Services to establish a process for reviewing eligible facilities requests, and to review submitted requests. SOF ¶ 27. The staff's review process and its review of requests such as Applicants' falls squarely within that delegation. Accordingly, all three *Randle* factors are met, and Planning Services' failure to grant the Application was conduct by a final policymaker that deprived Applicants of a federal right in violation of Section 1983.

### C. The Court Should Award Reasonable Costs and Attorney's Fees.

Plaintiff's failure to grant Applicants' EFR has deprived Applicants of their federal right to modify their wireless facilities. Because Plaintiff's actions violate Section 6409, the actions were committed by a final policymaker, and Congress has not foreclosed such relief, Defendants have a claim under Section 1983 and are entitled to reasonable costs and attorney's fees, including expert fees, under Section 1988. Particularly given the extent to which the County's delay and attempted gamesmanship of the process frustrate the national priority to bring advanced telecommunications services to all Americans, and the need to signal to other municipalities that such conduct will not be tolerated, the Court should grant Defendants' request for costs and fees.

## IV. APPLICANTS ARE INDEPENDENTLY ENTITLED TO RELIEF BECAUSE DENIAL OF THE APPLICATION WOULD HAVE THE EFFECT OF PROHIBITING SERVICE IN VIOLATION OF FEDERAL LAW.

Plaintiffs have also effectively prohibited wireless service, which provides an independent ground for relief. Section 332 of the Communications Act provides that regulation of the

"modification of personal wireless service facilities by any State or local government or instrumentality thereof . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). One way that an entity can prevail on a claim of effective prohibition is to demonstrate that (1) preventing construction of the proposed facilities prevents the entity from closing a "significant gap" in existing services; and (2) the proposed facilities were the "least intrusive means" of closing the gap. *AT&T Mobility Servs., LLC v. Vill. of Corrales*, 642 F. App'x 886, 889 (10th Cir. 2016).[3]

The Tenth Circuit has confirmed that "[a]s to whether there was a significant gap. . . there are no bright-line rules but . . . each case is to be considered on its own, taking into account a number of factors . . . including the gap's physical size and location, the number of affected customers, dropped-call or failure rates, and whether the purported gap affects a plaintiff's ability to provide outdoor, in-vehicle, and in-building coverage." *Id.* (quotation marks omitted). The court need not consider every factor to find that a significant gap exists, *id.* at 891, and a lack of

---

[3]     In its *2018 Infrastructure Order*, the FCC emphasized that tests such as those that look at the "significant gaps" are not the only—or even the primary—means to show a prohibition. The agency concluded instead that there is an effective prohibition any time a locality "materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment." *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, WT Dkt. Nos. 17-79, 17-84, FCC 18-13, ¶16 (rel. Sept. 27, 2018) ("*2018 Infrastructure Order*"). "This test is met not only when filling a coverage gap but also when densifying a wireless network, introducing new services or otherwise improving service capabilities." *Id.* ¶ 37. "Decisions that have applied solely a 'coverage gap'-based approach under Section 332(c)(7)(B)(i)(II) reflect both an unduly narrow reading of the statute and an outdated view of the marketplace." *Id.* ¶ 40. While the *2018 Infrastructure Order* clarifies that Sections 253 and 332 extend to material inhibitions well beyond those that create a significant gap, where, as here, a carrier can show a significant gap, that continues to represent a violation of Section 332, though a carrier need no longer show that the facility in question is the "least intrusive" means of filling that gap. *Id.* at fn. 94 (rejecting tests that "requir[e] applicants to show that the proposed facilities are the 'least intrusive means' for filling a coverage gap").

18

in-building coverage by itself can cause a significant gap. *See, T-Mobile Cent., LLC v. Unified Gov't of Wyandotte Cty.,* 528 F. Supp. 2d 1128, 1169 (D. Kan. 2007), *aff'd in part sub nom. T-Mobile Cent., LLC v. Unified Gov't of Wyandotte Cty.*, 546 F.3d 1299 (10th Cir. 2008) (Where "T–Mobile has proven a significant gap with respect to in-building coverage, it is unnecessary" to review whether there is also a gap in outdoor or in-vehicle coverage).

Here, an unrebutted analysis by Defendants' expert witness using reliable propagation data demonstrates that T-Mobile has a significant gap in its in-building coverage that would be remedied by the proposed modifications. In the vicinity of the site at issue, T-Mobile provides wireless services using spectrum in the 700 MHz, 1900 MHz, and 2100 MHz frequency bands. SOF ¶ 8. T-Mobile has a gap in its 1900 and 2100 MHz in-building coverage spanning an area that contains 7,000 residents, and a gap in its 700 MHz in-building coverage spanning an area that contains 6,500 residents. SOF ¶¶ 33-34. This is more than sufficient to constitute a significant gap. *See AT&T Mobility*, 642 F. App'x at 891 (two-mile gap in in-vehicle coverage and one-mile gap in in-building coverage was a significant gap in service); *Unified Gov't,* 546 F.3d at 1168 (gap in in-building service covering 600 households was a significant gap). The modifications proposed in the Application would add 700 MHz capacity to the existing site, remedying a significant portion of the gap by providing 6 square miles of in-building residential coverage, serving 5,451 people living in the significant gap area, SOF ¶ 35.

Although the FCC has determined that applicants may no longer be required to show that the facilities proposed to close a service gap are the least restrictive means to sustain a prohibition of service claim under Section 332, *supra* n.2, Defendants' proposal is indisputably the least intrusive means to close the gap in service. The Application seeks to modify a structure at which

T-Mobile already operates wireless facilities by replacing the existing antennas with new, larger antennas that have 700 MHz capabilities.  Using existing towers is frequently acknowledged as the least intrusive means for remedying service gaps, by localities and courts alike.  *See, e.g., Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 559 (S.D.N.Y. 2009) ("By choosing to co-locate antennas on an existing tower, T–Mobile has chosen both the least intrusive means to fill a significant gap in coverage, as well as the means that complies with the Town's co-location preference as stated in its Code.").  Further, Defendants' unrebutted expert report confirms that the existing surrounding sites cannot be modified or enhanced to close the gap, and that Applicants' proposed modification is the minimum height to achieve reliable service. SOF ¶ 36.

Under the most stringent of tests, the uncontroverted facts demonstrate that precluding the modification requested in the Application would have the effect of prohibiting service in violation federal law.  Accordingly, judgment must be entered for Defendants.

## CONCLUSION

In light of the foregoing, Defendants urge the Court to grant summary judgment in their favor.

Respectfully submitted,
/s/ *Joshua S. Turner*
Joshua S. Turner
Sara M. Baxenberg
**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C. 20006
Tel: (202) 719-7000
jturner@wileyrein.com
*Counsel for Crown Castle and T-Mobile*

November 2, 2018

## CERTIFICATE OF SERVICE

I, Joshua S. Turner, hereby certify that on November 2, 2018, I electronically filed the

forgoing through the Court's CM/ECF system which will send notification of such filing to the

following e-mail addresses:

djohnson@douglas.co.us

Respectfully submitted,
*/s/ Joshua S. Turner*
Joshua S. Turner
**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C. 20006
Tel: (202) 719-7000
Fax: (202) 719-7049
*jturner@wileyrein.com*
*Counsel for Crown Castle and T-Mobile*