IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  17-cv-03171-RM-NRN

BOARD OF COUNTY COMMISSIONERS FOR DOUGLAS COUNTY, COLORADO,

Plaintiff,

v.

CROWN CASTLE USA, INC. and
T-MOBILE WEST LLC,

Defendants.

---

**REPORT AND RECOMMENDATION ON THE PARTIES' RESPECTIVE CROSS-
MOTIONS FOR SUMMARY JUDGMENT
(DEFENDANTS' MOTION DKT #61 AND PLAINTIFF'S MOTION DKT #62)**

---

**N. Reid Neureiter
United States Magistrate Judge**

Now before the Court is Plaintiff/Counter-Defendant the Board of County

Commissioners for Douglas County's ("Plaintiff" or "Douglas County") Motion for

Summary Judgment (Dkt. #62) and Defendants/Counter-Plaintiffs Crown Castle USA,

Inc. ("Crown Castle") and T-Mobile West LLC's ("T-Mobile", and collectively with Crown

Castle, "Defendants" or "Company Defendants") own Motion for Summary Judgment

(Dkt. #61). The Court has reviewed the motions, responses, replies, accompanying

statements of undisputed fact, and attached exhibits.  In addition, the Court heard

extensive oral argument on the motions on February 4, 2019.   The Court has taken

judicial notice of the Court's file and has considered the applicable Federal Rules of

Civil Procedure and case law.

The Court recommends that Douglas County's Motion for Summary Judgment (Dkt. #61) be **GRANTED**, and the Company Defendants' Motion for Summary Judgment (Dkt. 62) be **DENIED**.

## 1. BACKGROUND

This case involves a desire by a wireless telephone provider (T-Mobile) and a wireless facilities infrastructure company (Crown Castle) to make modifications to an existing cellular telephone antenna installation in Castle Rock, Douglas County, Colorado. There is sometimes tension between the desire of cellular or wireless telephone companies to make bigger antennas and larger facilities to expand networks to improve cellular telephone coverage, and local governments' desire to maintain zoning, historic, or esthetic restrictions on the size or design of wireless antennae tower installations. Congress has passed legislation,[1] and the Federal Communications Commission ("FCC") has issued implementing regulations,[2] seeking to provide expedited mechanisms for the resolution of these competing interests. This case reflects the tension that exists between local zoning authorities and cellular providers, and involves application of the federal legislation and regulations intended to address that tension.

Douglas County initiated this action for declaratory relief on December 29, 2017. According to the Complaint (Dkt. #1), on May 18, 2017, the Company Defendants submitted an Eligible Facilities Request ("EFR") application (the "Application") "to collocate and modify wireless facilities on an existing support structure in Douglas

---

[1] Section 6409(a) of the Middle Class Tax Relief and Job Creation Act of 2012, codified at 47 U.S.C. § 1455(a).
[2] 47 C.F.R. § 1.40001 – Wireless Facility Modifications.

County." (*Id.* ¶ 2.) The pre-existing cellular facility structure allegedly had been designed with "stealth" features to look like a standard Douglas County utility pole, rather than an obvious cellular tower. Douglas County says it denied the Application on June 29, 2017, because the proposed modifications defeated the "concealment elements" of the structure, as they would more than double the width of the top ten or eleven feet of the existing structure. (*Id.* ¶¶ 2, 4.) According to Douglas County, with the proposed modifications, rather than looking like a utility pole, the revised structure would look like a giant marshmallow on a stick. (*Id.* ¶ 58.)[3] The relevant FCC regulation excepts from the expedited approval process proposed changes that defeat "concealment elements" of a support structure. Douglas County claims its determination was made within the 60-day period required by regulation—what the Company Defendants call the "shot-clock." (*Id.* ¶ 3.)

Douglas County alleges that rather than challenging the adverse determination in court as T-Mobile was entitled to do, four months later, on October 24, 2017, T-Mobile instead "unilaterally declared the federal 60-day shot clock to have restarted, notwithstanding the fact that the County had denied the application months earlier." (*Id.* ¶ 7.) Then, when Douglas County allegedly did not make any further decision, T-Mobile declared that the "Eligible Facilities Request was now deemed granted" pursuant to a regulation that allows a request to a local authority to be "deemed granted" if a definitive decision on an application is not made within the 60-day "shot-clock" period. (*Id.* ¶ 8.)

---

[3] In a later filing, the Company Defendants dispute the marshmallow description, asserting instead that the updated facility would look more like a "cap on a pen" than a "marshmallow on a stick." (Dkt. #69 at 5-6).

In sum, Douglas County's lawsuit requests a declaration that the Company Defendants' assertion of a "deemed granted" remedy is void, and that Company Defendants waived any challenge to the County's June 29, 2017 determination by failing to timely seek relief. Alternatively, even if the Company Defendants' May 18, 2017 application was still pending after Douglas County issued its June 29, 2017 determination, Douglas County seeks a ruling that the Company Defendants' request did not qualify for approval as an EFR because it changed the stealth characteristics of the original tower, and therefore is not subject to a "deemed granted" remedy. (*Id.* ¶ 9.)

The Company Defendants answered the Complaint and filed counterclaims. *See* Dkt. #28 (Answer and First Amended Counterclaims). The Company Defendants contend that Douglas County, in an effort to evade judicial review, never actually denied the Application. (*Id.* at 13, ¶ 2.) The Company Defendants allege that instead, on June 29, 2017, Douglas County returned a "Pre-submittal Review," which contained staff comments on the Application and requested additional materials. (*Id.* at 19-20, ¶¶ 46, 49.) The Company Defendants argue that Douglas County's response was not a denial and, because it requested more information, necessarily tolled the "shot-clock"—the limited time within which Douglas County had to issue a decision. (*Id.* at 20, ¶ 51.)

On October 24, 2017, T-Mobile's lawyer sent a letter to Douglas County "explaining that, under federal law, the Application does not substantially change the existing tower." The letter declared that submission of this additional information (the October 24 letter) restarted the "shot-clock." (*Id.* ¶¶ 55-56.) Under the Company Defendants' formulation, the restarted "shot-clock" expired on November 18, 2017. And so, on December 1, 2017, without any new decision by Douglas County approving or

denying the application, the Company Defendants sent Douglas County a letter asserting that the Application was "deemed granted" by operation of law, and announcing they intended to commence construction. (*Id.* at 21, ¶¶ 60-61.)

Count One of the Company Defendants' Counterclaims alleges that Douglas County violated Section 6409(a) (codified at 47 U.S.C. § 1455) and its associated regulation, by denying and failing to approve an EFR for a modification of an existing wireless tower that does not substantially change the physical dimensions of such tower or base station. According to the Company Defendants, Douglas County's failure to approve the Application violates federal law, and therefore should be deemed granted.

Count Two of the Company Defendants' Counterclaims alleges that Section 6409 creates a federal right because it requires State and local governments to approve a wireless carrier's valid EFR application. According to the Company Defendants, by failing to approve the Application, Douglas County has deprived the Company Defendants of a right, privilege, or immunity secured by the Constitution and laws of the United States (specifically the Spectrum Act), in violation of 42 U.S.C. § 1983.

This Court previously issued a Report and Recommendation recommending that the Company Defendants' Section 1983 claim be dismissed (*see* Dkt #72) and therefore will not address the substance of the Section 1983 claim any further. That issue is now before Judge Moore on the Company Defendants' objection. (*See* Dkt #77.)

The Company Defendants' third counterclaim alleges a violation of 47 U.S.C. §332(c)(7)(B)(i)(II). That statutory provision provides that the regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof shall not prohibit or have the effect

of prohibiting the provision of personal wireless services. The Company Defendants assert that Douglas County's alleged failure to act on the Company Defendants' application effectively prohibits the provision of personal wireless services, in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II).

On July 7, 2018, the Company Defendants filed a Motion for Judgment on the Pleadings (Dkt #49). That motion was fully briefed and argued, but was then effectively superseded by the Parties' respective motions for summary judgment. Finding the issues raised in the Motion for Judgment on the Pleadings were better addressed via the Parties' summary judgment motions, on December 19, 2018, I recommended that the Defendant's Motion for Judgment on the Pleadings be denied without prejudice to the legal arguments raised therein. (Dkt. #73). No one objected to that recommendation and Judge Moore accepted and adopted it on February 19, 2019. (Dkt. #85.)

I heard one-and-a-half hours of argument on the cross-motions for summary judgment on February 4, 2019.

## 2. LEGAL STANDARD FOR MOTION FOR SUMMARY JUDGMENT

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, i.e., the

evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432

F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences

in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of*

*Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

### 3. ALL MATERIAL FACTS ARE UNDISPUTED

Counsel for both parties were asked at oral argument whether there were *any*

disputed material facts that conceivably might prevent the grant of summary judgment

and require a trial. Counsel for both sides were in agreement that the facts are

undisputed and a trial would serve no meaningful purpose.  It is a question only of

applying the law to those undisputed facts.  In other words, both sides concurred that

this litigation should be resolved on the briefs, accompanying affidavits, documents, and

exhibits, without the need for any trial testimony.

### 4. ISSUE OF ALLLEGED FAILURE BY DOUGLAS COUNTY TO DISCLOSE CERTAIN SITE IMPROVEMENT PLAN DOCUMENTS

In their Opposition to Douglas County's Motion for Summary Judgment, the

Company Defendants repeatedly complain that Douglas County references Site

Improvement Plan ("SIP") documents drafted or submitted near the time of the 2001-

2002 initial application to build the Tower. The Company Defendants insist in their

written materials that "Plaintiff failed to produce these exhibits at any point during

discovery. Accordingly, pursuant to Rule 37(c)(1), the County 'is not allowed to use that

information . . . to supply evidence on a motion, at a hearing, or at trial . . . '." (Dkt. #69

at 4.) Douglas County had included the SIP documents to support Douglas County's

position that the Tower was originally designed, approved, and constructed as a "stealth

facility," meaning it was designed to look like something other than an obvious cellular tower.

The Company Defendants argued in their papers that these SIP documents were never disclosed. But, in fact, they were disclosed as part of Douglas County's initial disclosures in March of 2018. In those initial disclosures, Douglas County stated its intention to rely on the 2001 and 2002 SIP files approving construction of the Tower. The 2001 and 2002 SIP files were records available to the public (and the Company Defendants) for inspection.

After receiving the Rule 26 disclosures in March of 2018 showing Douglas County's intention to rely on the original SIP documents, the Company Defendants never asked for copies of those materials and, after disclosures were made, no documents were exchanged by either party because of the assumption that both sides either possessed or had access to all relevant documents. In addition, at oral argument, the Company Defendants' counsel effectively withdrew the argument that the Court should not consider the SIP documents, saying "I don't think that this Court needs to resolve that question, and I'm not pushing that."

The Court finds that Douglas County did properly and timely disclose its intention to rely on the original SIP documents from 2001 and 2002. The Company Defendants never requested copies from Douglas County and never independently sought to obtain copies even though the documents were public records. Therefore, it is appropriate for the Court to consider the original SIP documents in connection with the cross-motions for summary judgment.

## 5. UNDISPUTED FACTS

This recitation of undisputed facts comes from both Douglas County's or the Company Defendants' respective statements of undisputed material facts or the replies thereto, as well as associated supporting documents. (Dkt. #61-1; Dkt. #69-1; Dkt. #70; Dkt. #80-1.)

1. Crown Castle owns, operates, and maintains a network of infrastructure for the deployment of telecommunications facilities. T-Mobile provides "personal wireless services" and "wireless services" as those terms are defined under federal law.

2. T-Mobile operates wireless telecommunications facilities on a structure located in Douglas County, at 4545 E. Highway 86, Castle Rock, Colorado (the "Tower"). The Tower is a 35-foot tall pole, 18 inches in diameter.

3. T-Mobile wants to update and modernize the equipment in the Tower. There are gaps in T-Mobile's coverage area for certain radiofrequency bands in the vicinity of the Tower, spanning an area that contains upwards of 6,500 residents. As a result, without updated and expanding its Tower facility, T-Mobile is not able to provide coverage and capacity to a significant area of Castle Rock, Colorado.

4. Douglas County, for its part, has attempted to balance the need for the provision of wireless telecommunications services with the desire to preserve its unique visual environment by seeking to locate wireless communications facilities in a manner that blends with the character of the surrounding environment, and consistent with the requirements of federal law. Accordingly, the County has

enacted a Zoning Resolution that includes design standards applicable to personal wireless communications facilities.

5. Section 27A of Douglas County's Zoning Resolution includes certain "stealth" requirements for personal wireless communications facilities, providing: "The construction of stealth or faux structures such as windmills, silos and light standards specifically to camouflage personal wireless communication facilities are encouraged . . . All stealth or faux structures proposed shall emulate architectural style, height, bulk, mass, material, and color and (sic) determined by the County. . . . Personal wireless communication facilities located on highly visible sites will only be allowed when appropriately camouflaged." Zoning Resolution §27A, p.2 §2702A (Dkt. #63-2).

6. The Site Improvement Plan or "SIP" allowing for the initial construction of the Tower included concealment elements in the structure's design—ensuring that it would look like a utility pole. The stealth design satisfied a substantial portion of the approval criteria applicable to such facilities as set out in Douglas County's zoning resolution. During the approval process prior to the 2002 construction of the Tower, the Site Improvement Plan submitted to the County by the constructor's consultant specified that the facility would be constructed "with a stealth design to match existing utility poles in the area." Affidavit of Jeanette Bare at ¶15-17 (Dkt. #63-1).

7. As explained in the 2001 SIP documentation, "The proposed cell site meets the second order of preference by being concealed within a new 35' stealth canister pole and an adjoining shed. *The pole will be of similar height as the existing*

*utility poles on the property, and will be painted brown to further blend in with these existing poles.* The shed will be painted to match the existing house on the property. Given these features, the cell site will blend in with its surroundings." (Dkt. #63-4) (emphasis added). The same 2001 document also states that "The proposed cell site will be very compatible with the existing structures on the property. As mentioned earlier, the antennas will be concealed within a *canister pole of similar height and color as the existing utility poles on the property.*" (*Id.*) (emphasis added). The document continues, "The proposed cell site is to be disguised in an architecturally appropriate manner with the surrounding structures on the property. The antennas will be concealed *within a canister pole of similar height and color as the existing utility poles on the property.*" (*Id.*) (emphasis added).

8. Consistent with Douglas County's approval of the Tower as a "stealth" facility similar in shape and height to existing Douglas County utility poles is a March 15, 2002 letter from the Douglas County Planning staff asking that the applicant "verify that the proposed stealth utility pole is 18" or less in diameter, and add a note to that effect." (Dkt #63-5 at 4.)

9. The Company Defendants' own 2017 application to modify the Tower concedes that the existing facility includes "stealth" design components, stating the "Facility is a large concealed structure on the Southwest corner of the RTD Parking lot. All components of the wireless facility are inside the structure." (Dkt. #63-8 at 6.)

10. In the Spring of 2017, the Company Defendants began the process of seeking to modify the Tower.

11. Douglas County has an abbreviated application process for telecommunications applicants proposing collocation, removal, or replacement of transmission equipment on existing approved cellular towers pursuant to section 6409(a). Such an application is called an Eligible Facilities Request or "EFR," and the process for the abbreviated application process is called the "EFR Process." (Dkt. #63-1 (Bare Aff. ¶¶ 20-21).)

12. Applicants pursuing the EFR Process are required to submit a completed EFR application form; a letter of authorization from the land owner or tower owner; scaled plans reflecting the new facility; a description of how the proposed modification will comply with stealth requirements, including a photo simulation, for existing structures that were previously approved with stealth elements or conditions and the payment of the applicable fee. Douglas County Application for Eligible Facilities Request. (Dkt. #28-3.)

13. On April 27, 2017, Douglas County received an EFR application for the Tower from Brian Hess at Crown Castle, submitted on behalf of T-Mobile, including a cover letter with narrative describing the proposal. EFR Request by Crown Castle and T-Mobile dated April 27, 2017. (Dkt. #63-8.) On the same date, Crown Castle separately sent construction plans and the required application fee and asked for a copy of the original site improvement plan so the Company Defendants could prepare and submit scaled, redlined plans reflecting the proposed changes.

14. The modifications proposed in the Company Defendants' EFR application would remedy a significant portion of the cellular and mobile device coverage gap in the Castle Rock, Colorado area.

15. The application proposed adding amplifiers to the Tower, increasing the size of the cannister covering the antennas from 18 inches to 38 inches wide, and from 10 feet to 11 feet high, thereby increasing the height of the tower from 35 feet to 36 feet.

16. On May 4, 2017, Douglas County's Planning Services staff confirmed receipt of the Company Defendants' partial submission, provided a copy of the original Site Improvement Plan, and awaited receipt of the redline reflecting proposed modifications. Planning Services staff received the redlined site improvement plan on May 18, 2017. This completed the EFR Process application.

17. Once Douglas County received the Applicants' redlined site improvement plan on May 18, 2017, the EFR process was complete and the County believed its 60-day regulatory time-period (the so-called "shot-clock") for a decision to have begun. (Dkt. #63-1 (Bare Aff. ¶ 26).)

18. In early June, 2017, Douglas County's Planning Manager in the Department of Community Development, Jeanette Bare, discussed with Crown Castle's Brian Hess the fact that proposed modifications to the Tower would defeat the stealth design/concealment elements of the existing facilities and likely could not be approved through the EFR Process. (Dkt. #63-1 (Bare Aff. ¶ 27).)

19. The County and Applicants exchanged email correspondence addressing the County's concerns about the Application's compliance with the stealth requirements for the Tower. Crown Castle's own Brian Hess himself noted with respect to the proposed Tower: "existing stealth monopole: *Canister expansion*

*potentially defeats concealment element*." E-mail correspondence of June 14, 2017 (Dkt. #63-12) (emphasis added).

20. Douglas County's Planning Services staff and Crown Castle scheduled a meeting for June 22, 2017 to discuss two cell sites, one of which was the EFR Application for the Tower. The meeting took place at the County's offices and was attended by, among others, Jeanette Bare and Crown Castle's Brian Hess.

21. At the June 22, 2017 meeting, the Planning Services staff confirmed to Mr. Hess the staff's determination that the proposed modifications in the EFR Application for the Tower defeated the stealth design of the Tower and could not be approved through the EFR process. (Dkt. #63-1 (Bare Aff. ¶ 31).)

22. Planning Services staff then discussed with Mr. Hess alternative avenues for the Company Defendants to pursue the desired equipment upgrades for the Tower and what information would be required from the Company Defendants if they chose to pursue an alternate, non-EFR, application process. *Id.*

23. On June 29, 2017, Planning Services staff sent a Pre-submittal Review memorandum to the Company Defendants memorializing in writing the parties' June 22, 2017 meeting regarding the EFR application (the "Notice"). The Notice expressly states that the modification proposed in the EFR Application "does not meet approval standards." (Dkt. #63-14.)

24. The June 29, 2017 Notice explains that

> The original cell site was approved and constructed as a stealth utility pole. An expansion to 38" no longer provides a stealth design. The largest monopole (light pole, utility pole, or flag pole) which the County has approved is 24". Even for a proposed 24" diameter, the County would need to evaluate the context of the site and its proportionality to other

elements of the design. In addition, the canister diameter should not be significantly different from that of the pole itself. Since the proposed design does not meet the approval standards, we recommend you consider alternative designs or locations that can accommodate the increased antennas and other equipment in a stealth manner. A stealth windmill or silo design could be an appropriate choice for this location.

(Dkt. #63-14.) In other words, the Notice repeated and articulated in slightly different words what Crown Castle's own representative, Mr. Hess, had himself conceded in prior e-mail correspondence—that the proposed cannister expansion likely would defeat the "concealment element" of the original pole (the Tower) because it would significantly expand the diameter of the size of the cannister at the top of the pole. As a result, the application could not be approved as an EFR.

25. The Notice did not state that the May 18, 2017 EFR Application was incomplete, nor did it identify information that should have been, but was not, submitted for purposes of the EFR process. The Notice was clear that because the proposed design was no longer a stealth design, it did not meet EFR approval standards. (*Id.*)

26. Because the application could not be processed as an EFR, the June 29, 2017 memorandum explained further that instead, "The application will be processed as a Site Improvement Plan Revision." It then gave the Company Defendants instructions on how to proceed with the alternative of the more formal and detailed Site Improvement Plan Revisions: "Please refer to the following sections of the Douglas County Zoning Resolution (DCZR) for direction: Section 27 – Site

Improvement Plan; Section 27A – Personal Wireless Communication Facility Design Standards." (Dkt. 63-14 at p.11.)

27. The Company Defendants have submitted no affidavit from Crown Castle's representative, Mr. Hess, nor from anyone else, suggesting that the Company Defendants did not understand the June 29, 2017 Notice, or were unclear about the fact that the June 29, 2017 Notice conveyed the unequivocal message (previously communicated orally to Mr. Hess on June 22, 2017) that the EFR application would not be approved in an expedited fashion through the EFR Process because the proposal changed the stealth characteristics of the Tower.

28. In an effort to facilitate the alternative avenue for approval, Planning Services staff forwarded documentation to be completed for a Site Improvement Plan revision along with the June 29 Notice. (Dkt. #63-14.) This was consistent with the conversations that had occurred on June 22, 2017, when Planning Services staff had discussed alternative avenues for the Company Defendants to pursue the desired equipment upgrades for the Tower, as well as what information would be required if the Company Defendants chose to purse an alternate application process. (Dkt. #63-1 at ¶31.)

29. In approximately mid-June 2017, the Company Defendants submitted a revised photo simulation of the proposed modifications in their EFR Application reflecting the existing view of the Tower and a more accurately scaled representation of the proposed modification. (Dkt. #63-13.) Per the photo-simulation, the modified Tower depicted in the "proposed view" no longer looks like an unadorned utility pole, but looks instead, as Douglas County has argued in this litigation, like a

"marshmallow on a stick." In short, this photo-simulation, submitted by the Company Defendants, confirms that the proposed modifications would defeat the stealth design and concealment elements of original Tower:



(Images reproduced from Dkt. #63-13.)

30. Subsequent to June 29, 2017, Planning Services staff had a few brief email exchanges with Brian Hess regarding plans for the Tower to discuss alternative options for the equipment upgrades, but those limited communications ceased by mid-July 2017. The Company Defendants never pursued the alternative available process for a Site Improvement Plan revision for the Tower. (Dkt. #63-1 ¶33.)

31. On October 24, 2017, nearly four months after the Company Defendants received the June 29, 2017 Notice, Mr. Joshua Turner, Counsel for T-Mobile, located in Washington, D.C., sent a letter to Douglas County Planning Department staff (the "October 24 Letter"). (Dkt. #63-15.) The October 24 Letter disagreed with the County's characterization of the proposed modifications,

arguing that the modifications "do not 'substantially change' the physical dimensions of the existing structure, as that term is defined in federal law." The October 24 Letter specifically recognized that on June 29, 2017, Douglas County had written "that the proposed canister expansion defeats the concealment elements of the structure, and therefore the Request constitutes a substantial change in the structure and *is not an Eligible Facilities Request under federal law*. The County recommended that T-Mobile consider an alternative design or location for the structure." (Dkt. #63-15) (emphasis added). Mr. Turner's October 24 Letter then argues against this position, insisting that pursuant of Section 6409 and the FCC's binding regulations, the proposed change to the Tower does not constitute a "substantial change." (*Id.*)

32. Mr. Turner's October 24 Letter insisted that the proposed change "does not 'defeat the concealment elements' of the structure," in part because the existing wireless antennas are behind shrouds and the new proposed antennas would also be "fully concealed behind shrouds, and will not be visible to an outside observer. They will also continue to be mounted on a structure that resembles an unadorned pole." (*Id.*) The October 24 Letter asserted that there would be no change that would "alter the design so that it no longer resembles a tall, clean, unadorned pole." (*Id.*)

33. The October 24 Letter goes on:

> Because T-Mobile's Request does not substantially change the existing wireless structure, it is an Eligible Facilities Request under Section 6409. The timeline for reviewing this Request is set by the FCC's rules. The County has sixty days from the date T-Mobile submitted the Request to approve it. If the County fails to act by the time this "shot

clock" expires, the Requests [sic] is deemed granted. The County can toll this timeframe by providing notice within 30 days of receipt of the Request that there is missing information. Here, T-Mobile completed its Request on May 18, 2017. On June 22, 2017 [sic] the County returned its Presubmittal Review, requesting additional information, thus tolling the 60-day shot clock. This letter constitutes T-Mobile's response to that request. T-Mobile is therefore restarting the shot clock.

(Dkt #65-15 at p.4) (footnotes omitted).

34. On November 7, 2017, Douglas County Assistant County Attorney Chris Pratt responded to Mr. Turner's October 24, 2019 letter by first stating that T-Mobile had no pending application to do anything within Douglas County. Mr. Pratt also explained again that County staff did not consider T-Mobile's May application to be a valid EFR eligible for expedited handling

because of the substantial change in appearance that would result in a loss of the stealth characteristics of the existing facility at that site. What had appeared as an innocuous unused pole with nothing on it (thus the "stealth" designation) would change into what is clearly some sort of wireless communications facility with a large cylinder located at the top. Exasperating [sic] this proposed new condition is the location in a highly visible and trafficked urbanized area. This would clearly 'defeat the concealment elements' as contemplated in 47 C.F.R. § 1.40001(b)(7)(v) and is therefore a 'substantial change' that does not qualify for approval under 47 U.S.C. § 1455(a)(1).

(Dkt. #63-16.)

35. Mr. Pratt's November 7, 2018 letter continued, noting,

T-Mobile may still pursue building the facility sought at the location indicated in the presubmittal materials, but is on notice that in its current form, such an application would be processed under a Site Improvement Plan process pursuant to the County Zoning Resolution and that some additional steps to improve the stealth of the facility would likely be needed in order to be approved. County staff will be

available to help T-Mobile with this process as needed and
desired by your client.

(*Id.*)

36. Thus, in the November 7, 2017 letter, Douglas County effectively communicated

(1) for the second time, that the Company Defendants' application was not a

valid EFR and was not eligible for expedited approval under Section 6409; (2)

that because T-Mobile had never followed up on the Site Improvement Plan

Process, there was nothing pending *in November* for the County to accept or

reject; and (3) that there were alternative avenues for the Company Defendants

to obtain approval for the modifications they sought, but that those avenues

would be outside the EFR process.

37. Continuing the game of ping-pong correspondence, on November 14, 2017, T-

Mobile's counsel sent another letter to Douglas County informing the County that,

in substance, T-Mobile disagreed with Douglas County's EFR position, reargued

the view that the proposed modification is not a substantial change, and asserted

that because the County had never actually denied the EFR application and no

longer had the ability to toll the shot clock, the County had until November 18,

2017 to act on the application or it would be "deemed granted under Section

6409." (Dkt. #61-9.)

38. On December 1, 2017, the County received another letter from T-Mobile's

counsel. This letter declared Company Defendants' EFR application was

"DEEMED GRANTED" pursuant to operation of law because more than 60 days

(including tolling) had elapsed since the filing of the EFR by the Company

Defendants, and Douglas County allegedly had failed to act on the application.

(Dkt. #63-17.) The December 1, 2017 letter told Douglas County that if it wished to contest the "DEEMED GRANTED" notification, it had thirty days from the date of the notification to file a lawsuit contesting the DEEMED GRANTED status. Said the December 1 letter, "Failure to file a lawsuit within 30 days in a court of competent jurisdiction contesting the validity of the DEEMED GRANTED status will forever bar Douglas County from claiming that this permit application was DEEMED GRANTED." (Dkt. #63-17.)

39. Compelled by the Company Defendants' unilateral declaration that the permit application was deemed granted, Douglas County filed this lawsuit on December 29, 2017, seeking (among other things) a declaration that the assertion of the deemed granted remedy was void. The Company Defendants then filed their counterclaims.

6. **ANALYSIS OF ELIGIBLE FACILITIES REQUEST CLAIMS**

a. **Substantive Legal Framework**

Section 6409 provides that "a State or local government may not deny, and shall approve, any eligible facilities request for a modification of an existing wireless tower or base station that does not substantially change the physical dimensions of such tower or base station." 47 U.S.C. § 1455(a)(1). This was consistent with the overall objective of that legislation to expedite the construction of cellular facilities around the country. Relatively minor modifications to extant cellular facilities were not to be unduly delayed by bureaucratic local or state government approval processes.

Congress did not define the terms "substantially change" in Section 6409. But the FCC did define the terms via the rule-making process. Under the FCC's regulations, a

proposed modification "substantially changes the physical dimension" of an existing tower if, in relevant part, it adds more than 10 percent or more than ten feet to the height (whichever is greater) or adds an appurtenance larger than 20 feet, or if "[i]t would defeat the concealment elements of the eligible support structure." 47 C.F.R. § 1.40001(b)(7)(i), (v) (the "FCC Rule").

In adopting the Rule, the FCC elaborated:

> While we eliminate review procedures that are not necessary for small-size facilities collocated on existing structures, we do so in a manner that preserves local zoning requirements and rules requiring camouflage or concealment measures. In particular, the rules we adopt today will allow jurisdictions to retain their ability to protect aesthetic and safety interests.

*In the Matter of Acceleration of Broadband Deployment by Improving Wireless Facilities Siting Policies* (hereinafter, "*2014 Order*"), 29 FCC Rcd. 12865, 12867 (2014).

It is undisputed that the proposed physical changes to the Tower in this case fall within dimensional changes that would not qualify as "substantial" under the FCC Rule. So the question becomes whether, despite coming within the dimensional limitations, the proposed changes nevertheless would defeat the "concealment elements of the eligible support structure" under 47 C.F.R. § 1.40001(b)(7)(v). If the proposed changes do not defeat the "concealment elements" of the Tower as it was originally constructed, then the proposed changes are not a substantial change and Douglas County should have approved Company Defendants' application as a valid EFR. However, if the proposed changes do defeat the "concealment elements" of the preexisting Tower, the Company Defendants' application was not a valid EFR and was not entitled to the benefit of the expedited approval process.

### b. The Company Defendants' Application was not a valid EFR that the County was required by law to approve.

I find that the Company Defendants' proposed changes to the Tower would undermine the "concealment elements" of the original structure. Therefore, the Company Defendants' application was not a valid Eligible Facilities Request pursuant to the FCC Rule. *See* 47 C.F.R. § 1.40001(b)(7)(v). Because the proposed changes to the Tower tended to undermine the "concealment elements" of the original structure, the changes constituted a "substantial change," and Douglas County was under no legal obligation to approve it under Section 6409 [47 U.S.C. § 1455(a)(1)].

My reasoning is simple. In its 2014 Infrastructure Order, the FCC explained that "in the context of a modification request related to concealed or 'stealth'-designed facilities—i.e., facilities designed to look like some feature other than a wireless tower or base station—any change that defeats the concealment elements of such facilities would be considered a 'substantial change' under Section 6409(a)." *2014 Order*, 29 FCC Rcd. at 12950, ¶ 200.

In this case, it is undisputed that the original Tower was designed with stealth characteristics. It was intended to look like "some feature other than a wireless tower or base station"; specifically, it was designed to look like an unadorned utility pole, not readily recognizable as a cellular antenna tower. The original 2001-2002 SIP documents confirm this was the case. The photo-simulation, duplicated above, also confirms that the original pole looks like an unadorned utility pole. The pole with the proposed modifications does not. Early on in the application process, Crown Castle's own representative, Mr. Hess, recognized this reality with respect to the proposed

Tower by noting: "existing stealth monopole: Canister expansion potentially defeats concealment element." (Dkt. #63-12.)

And even the Company Defendants' own counsel acknowledged at oral argument that the original pole was intended to have stealth characteristics: "We have never taken the position that there are not concealment elements associated with this pole. We concede that there are concealment elements at issue here. We concede, in fact, that you can read generously, the initial approval as having a couple of different sorts of concealment elements that it had in mind." *See* FTR recording of Oral Argument of February 4, 2019 at 3:15:21 pm - 3:23:21 pm. But this concession by the Company Defendants was limited to the fact that there were purportedly only three identifiable concealment elements associated with the original approval: height (generally the same height as other utility poles in the area), color, and the fact that the antennae were to be concealed behind a shroud. The Company Defendants argue that because all three of these discrete concealment elements are maintained with the proposed modified facility, the proposal did not defeat the "concealment elements" of the original pole.

But the Company Defendants ignore the critical point. First, the undisputed facts show, based on documentation from 2001, that the original pole was intended to look like other utility poles in the area—not just because of height and color, but because it was the shape of a utility pole, and was intended to be a similar diameter to other utility poles. (*See* Dkt #63-4 (explaining that the pole will be "disguised in an architecturally appropriate manner with the surrounding structures of the property" and "will be of similar height as the existing utility poles on the property, and will be painted brown to further blend in with these existing poles"); Dkt #63-5 (describing the pole as "a stealth

utility pole" and seeking confirmation that the "proposed stealth utility pole is 18" or less in diameter").) Maintaining the shroud, the height, and color, while dramatically changing the silhouette of the top portion of the structure does not maintain the stealth or concealment elements of the original utility pole design. I therefore find, as a matter of law and undisputed fact, that the proposed Tower design, with the significantly larger diameter canister on top of the relatively thin support structure, does not look like an unadorned utility pole. It would not look like other utility poles in the area and, if constructed, would defeat the concealment elements of the original Tower. For that reason, Douglas County was correct in recognizing that the Company Defendants' application was not a valid EFR. The Company Defendants have submitted no evidence that would contradict this conclusion.

The Company Defendants argue that accepting Douglas County's position in this case would allow localities to be able to "unilaterally (and retroactively) designate which aspects of a facility's design are 'concealment elements,'" and would also give localities "the subjective discretion to determine when an otherwise-permissible change in size renders a pole insufficiently pole-like." (Dkt #61 at 8.) The Company Defendants further argue that "a subjective standard of this kind, leaving localities with nearly complete discretion to reject modifications regardless of size and scope, is completely inconsistent with the *2014 Order.*" (*Id.*) I reject this proposition. There is nothing "unilateral" or "retroactive" about the designation of the concealment aspect of this Tower's design. It originally was designed 18 years ago to look like a utility pole. The documentation proves it. There is no evidence in the record to suggest that, with an 18-inch diameter, it does not look like other utility poles in the Castle Rock area. Similarly,

there is nothing subjective about the conclusion by Douglas County that, with a 38-inch diameter cannister on top, the Tower will no longer look like other utility poles in the area. A glance at the photo-simulation submitted by the Company Defendants confirms this reality. This is an objective, not a subjective, conclusion of fact.

### c. Procedural Legal Framework of the "Deemed Grant" remedy.

The Company Defendants argue that even if their submission were not a valid EFR and Douglas County had no initial legal obligation to approve it, the Company Defendants should nevertheless prevail in this case based on the "deemed grant" remedy available under the FCC Rule.

The FCC requires that localities approve a *valid* EFR application within 60 days. *See* 47 C.F.R. § 1.40001(c)(2) ("Within 60 days of the date on which an applicant submits a request seeking approval under this section, the State or local government shall approve the application *unless it determines that the application is not covered by this section*.") (emphasis added). "The 60-day period begins to run when the application is filed, and may be tolled only by mutual agreement or in cases where the reviewing State or local government determines that the application is incomplete." *Id.* § 1.40001 (c)(3). To toll the timeframe, the locality must provide written notice to the applicant and clearly and specifically delineate all missing documents or information. *Id.* § 1.40001 (c)(3)(i). If tolled due to incompleteness, the timeframe for review begins running again when the applicant makes a supplemental submission in response to the locality's notice of incompleteness. *Id.* at § 1.40001 (c)(3)(ii).

If the locality fails to act on an EFR, the FCC Rule provides that the request will be deemed granted:

**Failure to Act:** In the event the reviewing State or local government fails to approve or deny a request seeking approval under this section within the timeframe for review (accounting for any tolling), the request will be deemed granted. The deemed grant does not become effective until the applicant notifies the applicable reviewing authority in writing after the review period has expired (accounting for any tolling) that the application has been deemed granted.

*Id.* at § 1.40001 (c)(4). Per the *2014 Order*, this entire deemed grant process is designed to reduce delays in the review process and facilitate the rapid deployment of wireless infrastructure. *2014 Order* at 12872, ¶15.

In light of this regulatory framework, the basic question here is whether Douglas County failed to act on the Company Defendant's EFR application. If Douglas County did fail to act within the timeframe provided for review, then the application arguably may have been deemed granted, even if it was never a valid EFR in the first place.

### d. Douglas County Acted on the Company Defendants' EFR application in a timely way.

I find, based on the undisputed facts, that Douglas County properly acted on the Company Defendants' EFR application by informing them, in writing, on June 29, 2017 that the application failed to meet EFR approval standards because it defeated the stealth characteristics of the pole as originally designed. This was consistent with the message that was conveyed at the June 22, 2017, meeting with Crown Castle's Mr. Hess. It is not plausible that the Company Defendants did not know or understand, on receipt of the June 29, 2017 Notice, that the County had not approved and would not be approving the application *as an EFR.* And, in fact, it is telling that the Company Defendants provide no affidavit from their own representative, or any other evidence of any kind, expressing any alleged "confusion" about Douglas County's alleged non-decision regarding the EFR Application.

Douglas County properly communicated within the requisite 60 days its view that the EFR was not valid. This is what is required under the FCC regulation: per § 1.40001(c)(2), "Within 60 days of the date on which an applicant submits a request seeking approval under this section, the State or local government shall approve the application *unless it determines that the application is not covered by this section.*" (emphasis added). Here, Douglas County "determined that the application is not covered by this section," and communicated that fact to the Company Defendants within the requisite 60 days. In this respect, I find that Douglas County did properly "act" on the application within the meaning of Section 6409(a) as implemented in § 1.40001 (c)(4).

The Company Defendants complain that Douglas County did not use the "magic" words: "deny" or "denial." But the message was clear. And I do not find that any more specific language was required to communicate a denial based on the County's view that this was not a valid EFR. *See T-Mobile South, LLC v. City of Roswell*, 135 S. Ct. 808, 815-16 (2015) (explaining that related provisions in Section 704 of the Telecommunications Act of 1996 requiring that determinations be made in writing and that the reason(s) for the determination be provided, do not specify a particular form or format, the reasons need not be elaborate or sophisticated, and that the explanation must simply be clear enough to permit judicial review, noting that the rule "ought not to unduly burden localities").

Moreover, the Company Defendants' counsel admitted the clear meaning of Douglas County's June 29 Notice at oral argument. When, during argument, I read aloud a portion of the June 29 Notice from Douglas County explaining that the proposed modifications changed the stealth characteristics of the Tower and therefore did not

meet approval standards, counsel acknowledged, "It is clear from that, that the County believes that this is not properly filed as an EFR. I completely agree that that is an accurate statement of what staff's opinion of what our application was." *See* FTR recording of Oral Argument of February 4, 2019. I therefore find that Douglas County timely acted on the Application by conveying the message, in writing, on June 29, 2017, that the EFR application did not meet approval standards because it changed the stealth characteristics of the pole.

Again, the Company Defendants have submitted no affidavit from any actual participant in the negotiations with Douglas County to suggest that they did not understand the meaning of the June 29, 2017 Notice, or that Douglas County had sent some kind of mixed message about whether the EFR application (as an EFR entitled to expedited review) was still under consideration after June 29, 2017. The silence of Mr. Hess speaks volumes.

### e. Because Douglas County acted on the EFR within 60 days by unequivocally stating in writing the application was not a valid EFR, the purported "deemed grant" is void.

After receiving the June 29, 2017 Notice from the County explaining the application could not be approved as an EFR (which followed up on the June 22, 2017 meeting which had communicated the same message), the Douglas County Defendants sent in a revised photo-simulation, consistent with the County's alternative suggestion that the Company Defendants could pursue a modification of the Tower via the more formal SIP process. And then the Company Defendants did nothing until nearly four months had passed after June 29, 2017, when the Company Defendants' lawyer sent what can only be characterized as a factually challenged October 24, 2017 letter.

The October 24 letter from the Company Defendants' counsel was not accurate in material respects. Contrary to the letter's assertions, the County did not request additional information to supplement the EFR application on June 22, 2017 (or in the June 29, 2017 Notice). And the County had made no mention of tolling any shot clock. The Company Defendants' October 24 letter did not provide any additional factual information in response to any information requests; it only provided legal argument. And there was no basis for T-Mobile to unilaterally claim that it had either stopped or restarted the "shot-clock" to demand a decision from the County, when the County had already decided and communicated to the Company Defendants' that the application was not a valid EFR. Per regulation, the "shot-clock" could only be tolled by mutual agreement or when the locality deemed the EFR application incomplete. 47 C.F.R. § 1.40001(c)(3). Neither of these conditions applied.[4]

---

[4] It is not immediately clear why the Company Defendants sought to fabricate a non-existent agreement to toll the shot clock. It may have been because they had waited too long to make a court challenge to Douglas County's June 29, 2017 adverse determination. Per the FCC's guidance, an adversely affected applicant whose EFR is not approved should sue within 30 days of the determination:

> However, given the foregoing Federal interest reflected in Section 6409(a), it would appear that the basis for equitable judicial remedies would diminish significantly absent prompt action by the aggrieved party. In our judgment, based on the record established in this proceeding, we find no reason why (absent a tolling agreement by parties seeking to resolve their differences) such claims cannot and should not be brought within 30 days of the date of the relevant event (i.e., the date of the denial of the application or the date of the notification by the applicant to the State or local authority of a deemed grant in accordance with our rules).

*2014 Order*, 29 FCC Rcd. at 12963-64, ¶ 236. Because "30 days of the date of the relevant event" (June 29) had long passed, the only basis for suing, or alternatively, asserting a deemed grant, as late as October, would have been if there had been an agreement to toll the 60-day shot-clock. Douglas County makes an argument that the Company Defendants waived their right to any relief, including "deemed grant" relief, by

But even if, somehow, the Company Defendants had not gotten the message on the June 29, 2017 then, at the very least, they should have gotten the message when Douglas County responded in writing on November 7, 2017 and repeated Douglas County's position that the Company's Defendants' submission was not a valid EFR:

> What had appeared as an innocuous unused pole with nothing on it (thus the "stealth" designation) would change into what is clearly some sort of wireless communications facility with a large cylinder located at the top. Exasperating [sic] this proposed new condition is the location in a highly visible and trafficked urbanized area. This would clearly 'defeat the concealment elements' as contemplated in 47 C.F.R. § 1.40001(b)(7)(v) and is *therefore a 'substantial change' that does not qualify for approval under 47 U.S.C. § 1455(a)(1).*

(Dkt. #63-16) (emphasis added). It is true that this November 7, 2017 letter again does not explicitly use the words "denial" or "deny," but the phrase "*does not qualify for approval under 47 U.S.C. § 1455(a)(1)*" conveys substantially the same meaning. By this letter, Douglas County again communicated that it had made its determination against the Company Defendants' EFR, but nevertheless welcomed a more formal and detailed Site Improvement Plan revision submission.

But even this was not enough for the Company Defendants, who responded on November 14, 2017 (again via counsel), that the shot clock continued to run, making the threat that "the County has until November 18, 2017 to act on T-Mobile's application, or it will be deemed granted under Section 6409." (Dkt. 61-9 at 3.)

Reading this correspondence in sequence brings to mind the famously absurd Monty Python "Dead Parrot" sketch. There, the dissatisfied purchaser of a demonstrably deceased parrot returns the carcass to the pet store, and the shop owner insists,

---

waiting for four months without there having been any tolling agreement. Because I decide in Douglas County's favor for other reasons, I do not reach this waiver issue.

against all evidence and more and more ridiculously, that the bird is not dead at all, but "resting," "stunned," or merely "pining for the fjords."[5]  Like the willfully blind pet shop owner, the Company Defendants continue to insist, even to this day, that their EFR application was never acted upon, when the undisputed facts show that Douglas County had both orally and twice in writing explained that the application "did not qualify for [EFR] approval" because it changed the stealth characteristics of the Tower.

In light of the undisputed facts, I find no legal or factual basis for the Company Defendants' attempted imposition of the deemed grant remedy. To this judge, it appears to have been a bullying tactic to force Douglas County into court as the Plaintiff bearing the burden of proof when, for its part, Douglas County had acted in a timely and appropriate fashion all along.  Indeed, the Company Defendants' brief provides a hint of why they tried to impose the "deemed grant" remedy, thereby forcing Douglas County to bring suit. *See* Company Defendants' Opposition to Plaintiff's Summary Judgment Motion (Dkt. #69 at 2) (suggesting that because Douglas County plays the role of plaintiff challenging the deemed grant, Douglas County "bears the burden to prove that 'the underlying application did not meet the criteria in Section 6409(a) for mandatory approval . . . or for other reasons is not appropriately 'deemed granted.'")(citing *2014 Order* at 12962, ¶ 231). The Company Defendants also present no evidence to explain why they waited four months before issuing a legal letter propounding the dubious "shot-clock tolling" theory, when they claim their only interest had been the expeditious installation of new Tower equipment. Had there really been a lack of clarity about the

---

[5] For a transcript of this famous sketch, *see* https://web.archive.org/web/20121012135336/http://www.mtholyoke.edu/~ebarnes/python/dead-parrot.htm

what the June 29, 2017 Notice meant, someone from the Company Defendants' business operations could have picked up the telephone, called Douglas County planning staff, and asked the question. In any event, after sending the shot-clock tolling letter, the Company Defendants got a letter back from Douglas County's counsel on November 7, 2017 explaining again that the EFR was not subject to approval. This second written communication from Douglas County fell within the supposed (unilaterally) tolled shot-clock. This is a second reason why the imposition of the deemed grant remedy was inappropriate.

For the above reasons, I find that the "deemed grant" remedy which the Company Defendants sought to impose is void and without effect.

### 7. Douglas County is entitled to summary judgment on the Company Defendants' Claim under 47 U.S.C. § 332(c)(7)(B)(i)(II).

The Company Defendants also claim that they are entitled to relief under Section 704 of the Telecommunications Act of 1996 ("TCA"), 47 U.S.C. § 332 (c)(7)(B)(i)(II). This statute provides that a locality's regulation of the "placement, construction, and modification of personal wireless service facilities. . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services."

One historic test for whether a locality has violated 47 U.S.C. § 332 (c)(7)(B)(i)(II) is for the applicant to demonstrate that (1) preventing construction of the proposed facilities prevents the cellular provider entity from closing a "significant gap" in existing services; and (2) the proposed facilities were the "least intrusive means" of closing the gap. *AT&T Mobility Servs., LLC v. Vill. of Corrales*, 642 F. App'x 886, 889 (10th Cir. 2016). Other courts have recognized that such an unlawful prohibition may occur where "further reasonable efforts [by the applicant] are so likely to be fruitless that it is a waste

of time to even try." *Nat'l Tower, LLC v. Plainville Zoning Bd. Of Appeals,* 297 F.3d 14, 20 (1st Cir. 2002) (quoting *Town of Amherst, N.H. v. Omnipoint Commc'ns Enters.,* 173 F.3d 9, 14 (1st Cir. 1999)) "Setting out criteria under the zoning law that no one could ever meet" is another example of an effective prohibition that would be unlawful under this statute. *Nat'l Tower,* 297 F.3d at 23. *See also Nextel West Corp. v. Town of Edgewood, New Mexico*, 479 F.Supp.2d 1219 (D. N. Mex. 2006) (laying out standard and granting summary judgment in cellular provider's favor, after finding that locality had effectively prohibited the provision of personal wireless services in denying special use permit for proposed antenna array).

The Company Defendants cite a 2018 FCC Infrastructure Order, WT Dkt. Nos. 17-79, 17-84, FCC 18-13, ¶16 (rel. Sept. 27, 2018), for the proposition that the "least intrusive means" should no longer be part of the test for whether there is an effective prohibition, but also argue that, under the undisputed facts in this case, modifying the existing Tower is indisputably the least intrusive means for closing the existing coverage gap. (*See* Dkt. #61 at 18 n.3.)

While there may be a significant gap in coverage in the Castle Rock, Colorado area, the Company Defendants have provided no evidence at all that Douglas County's regulations "have the effect of prohibiting the provision of personal wireless services."

The Company Defendants have not shown that they even tried to apply under the County's normal [non-EFR] SIP revision process, and have not demonstrated that additional reasonable efforts to obtain approval from the County would be "fruitless." The evidence shows only that the Company Defendants' Application, as submitted, was not a valid EFR and was not entitled to expedited EFR approval. The undisputed

evidence also shows that Douglas County repeatedly suggested that the Company Defendants submit a more formal application for modification of the existing Tower via the SIP revision process. The Company Defendants never did that—electing instead to try to impose the "deemed grant" remedy.

Thus, there is no evidence at all that if the Company Defendants had tried to submit a revised SIP, that such an application would have been unreasonably denied by Douglas County. *See Town of Amherst*, 173 F.3d at 14 (finding the carrier had failed to show "such fixed hostility" by the town board that one could conclude further applications would be useless where board members expressed concern about height of a proposed tower but indicated that they would welcome negotiations for alternatives with the carrier). Neither have the Company Defendants submitted any legal authority to suggest that they are entitled to circumvent entirely a locality's SIP revision zoning process without even trying and to get court relief merely by showing there is an existing substantial gap in coverage, without presenting the issue to the locality in the first instance.

The Company Defendants assert that requiring the Company Defendants to actually go through the SIP revision process would be "elevating form over substance" and also argue that "forcing the Defendants to go through the discretionary process by the County will not make the [coverage] gap less significant, nor will it make the other alternatives less intrusive." (Dkt. #69 at 20.)

But the Company Defendants again miss the point. In Section 704 of the Telecommunications Act ("TCA") (codified at 47 U.S.C. § 332(c)(7)), on which this claim is based, Congress sought to expressly preserve the traditional authority enjoyed by

state and local governments to regulate land use and zoning, while imposing certain "substantive and procedural limitations upon the authority of state or local governments to regulate the construction of facilities for wireless communication services." *Preferred Sites LLC v. Troup County*, 296 F.3d 1210, 1214-15 (11th Cir. 2002). *See also Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d 529, 531 (2d Cir. 2005) ("The TCA thus strikes a balance between 'two competing aims–to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers.'") (quoting *Town of Amherst,* 173 F.3d at 13). *See also Sw. Bell Mobile Sys., Inc. v. Todd*, 244 F.3d 51, 57 (1st Cir. 2001) (explaining that the procedural and substantive limitations of the TCA "subject local governments to an outer limit upon their ability to regulate personal wireless services land use issues") (internal quotations and alterations omitted). Section 704 does not contemplate that a telecommunications company can avoid local zoning processes altogether by merely by showing a substantial gap in coverage. No case cited by the Company Defendants provides such relief.

To get relief under Section 704 of the TCA, the Company Defendants must show that Douglas County actually "prohibited" the installation of a facility which might close a significant coverage gap. Because the Company Defendants have not availed themselves of the normal available zoning processes, despite Douglas County's encouragement to do so, the Company Defendants cannot show and have not shown that, to date, Douglas County's conduct "prohibited" or "had the effect of prohibiting" anything.

I therefore conclude that the Company Defendants have failed to show that they are entitled to relief under 47 U.S.C. § 332 (c)(7)(B)(i)(II).

## CONCLUSION

I therefore **RECOMMEND** that Douglas County's Motion for Summary Judgment (Dkt. #32) be **GRANTED**, and that the Company Defendants' Motion for Summary Judgment (Dkt. # 61) be **DENIED**.

I further **RECOMMEND** that judgment be entered in favor of Douglas County on its declaratory judgment claim that the "DEEMED GRANTED" remedy is void and of no effect. I also **RECOMMEND** that judgment be entered in favor of Douglas County and against the Company Defendants on Douglas County's declaratory judgment claim that the Company Defendants' May 18, 2017 Application was not covered by Section 6409(a) and the FCC Rule implementing that statute because the proposed modifications to the Tower defeated the concealment elements of the eligible support structure.

I further **RECOMMEND** that judgment be entered against the Company Defendants and in favor of Douglas County with respect to the Company Defendants' Counterclaim Count One (Violation of 47 U.S.C. § 1455); Counterclaim Count Two (Violation of 42 U.S.C. § 1983); and Counterclaim Count Three (violation of 47 U.S.C. § 332(c)(7)(B)(i)(II)).

Finally, I previously recommended that Counterclaim Two of the Company Defendants' Counterclaims, relating to 42 U.S.C. § 1983, be dismissed. However, In light of my conclusions here that Douglas County violated no federal law in declining to approve the Company Defendants' EFR Application, there is no basis at all for

imposition of liability under § 1983, whether or not my prior recommendation to dismiss the §1983 claim is accepted.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case.  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  The District Judge need not consider frivolous, conclusive, or general objections.  A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge, *Thomas v. Arn*, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colorado Dep't of Corrections*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**

BY THE COURT

Date:  March 4, 2019
     Denver, Colorado

N. Reid Neureiter
United States Magistrate Judge