# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
# Judge Raymond P. Moore

Civil Action No. 1:17-cv-3171-RM-NRN

Board of County Commissioners for
Douglas County Colorado,

    *Plaintiffs-Counterclaim Defendant*,

    *v.*

Crown Castle USA, Inc., and
T-Mobile West LLC,

    *Defendants-Counterclaim Plaintiffs*.

---

# **ORDER**
---

This case involves efforts by a wireless telephone provider (T-Mobile) and a facilities infrastructure company (Crown Castle) to make modifications to an existing cellular telephone antenna installation in Douglas County, Colorado. Generally, there is a tension between wireless telephone companies' desire to expand coverage and local governments' will to maintain zoning, historic, and aesthetic standards. Congress has passed legislation, and the Federal Communications Commission ("FCC") has issued regulations, providing mechanisms for the resolution of these competing interests. This dispute zeroes on whether or not the County properly denied Defendants' antenna modification application and the legal effect of communications (and silence) between them. Briefing on Defendants' objections to the recommendation (ECF No. 86) on the parties' cross-motions for summary judgment is incomplete. At present, the Court is concerned only with whether Defendants' 42 U.S.C. § 1983 Amended Counterclaim survives the County's motion to dismiss.

I. **BACKGROUND**

After the County initiated this action seeking declaratory relief, Defendants filed three amended counterclaims (ECF No. 28, at 13–30), from which the Court takes the following material allegations to be true for the purposes of the County's present motion to dismiss. (Motion, ECF No. 30.)

A. **Counterclaim Allegations**

T-Mobile provides telecommunications, commercial mobile radio, and personal and advanced wireless services to businesses and the general public. (Am. Countercl. ¶¶ 16, 19.) Crown Castle owns, operates, and maintains an infrastructure network, upon which its customers, like T-Mobile, have situated facilities that provide these wireless services. (*Id.* ¶ 14.) A wireless facility serves a particular geographic area and normally consists of several antennas, which may be attached to a tower, monopole, or other structure in public right-of-way or private utility easements, along with ancillary equipment necessary for the operation of that facility. (*Id.* at 20–21.) T-Mobile must periodically upgrade and modify its existing facilities, including through adding capacity, using new technologies, and adding new spectrum bands as authorized by the FCC. (*Id.* at 23.)

Federal law permits, but limits, a local government's control over modifications to wireless facilities, including its ability to deny applications to construct those modifications. *See* 47 U.S.C. § 1455 ("Spectrum Act"); *see also* 47 U.S.C. § 332. "[A] State or local government may not deny, and shall approve, any eligible facilities request [("EFR")] for a modification of an existing wireless tower or base station that does not substantially change the physical dimensions of such tower or base station." 47 U.S.C. § 1455(a)(1). FCC regulations require a local government to approve EFR applications within 60 days of their submission ("shot clock").

47 C.F.R. § 1.6100(c)(2).[1] The 60-day period may only be tolled by mutual agreement between the local government and applicant or if the local government determines that the application is incomplete. 47 C.F.R. § 1.6100(c)(3). If an application is incomplete, the local government must provide written notice of that circumstance, including what information is missing, within 30 days of the application submission. 47 C.F.R. § 1.6100(c)(3)(i). When the applicant submits supplemental information, the shot clock resumes running, and the local government has 10 days to notify the applicant of any further deficiencies. 47 C.F.R. § 1.6100(c)(3)(ii)–(iii). If a local government fails to timely approve or deny an EFR, "the [EFR] shall be deemed granted. The deemed grant does not become effective until the applicant notifies the applicable reviewing authority in writing after the review period has expired (accounting for any tolling)." 47 C.F.R. § 1.6100(c)(4). Applicants subject to adverse decisions by local governments may bring claims related to this process in any court of competent jurisdiction within 30 days of such decision. 47 U.S.C. § 332(c)(7)(B)(5); 47 C.F.R. § 1.6100(c)(5).

The County provides a form for submitting EFRs. (Am. Countercl. ¶ 32.) On April 27, 2017, Crown Castle, on behalf of T-Mobile, submitted an EFR application to the County to modify a communications tower located at 4545 E. Highway 86, Castle Rock, CO, 80104 ("Application"). (*Id.* ¶ 25.) That tower uses concealment panels to hide the antennas and associated equipment from view, reducing the visual impact of the tower, and the Application proposed to modify the tower by replacing and adding facilities that would grow the concealment shroud from 18 inches to 38 inches wide and from 10 feet to 11 feet high—increasing the height of the tower from 35 feet to 36 feet. (*Id.* ¶¶ 26–27.) Following the modification, the communications tower would still use concealment panels to hide the antennas and associated

---

[1] In their briefing, the parties cite these regulations as 47 C.F.R. § 1.40001, which was redesignated as 47 CFR § 1.6100. 83 FR 51886 (Oct. 15, 2018).

equipment from view, and no antennas or associated equipment would be visible following the modification. (*Id.* ¶¶ 30–31.) The Application—which expressly noted that it was an EFR as recognized by federal law and was not merely for pre-submittal review—included a cover letter, project narrative, photo simulation, preliminary drawings, structural analysis, an application fee, and letters of authorization from the tower and land owners. (*Id.* ¶¶ 33, 36–37.) The Application further explained why Defendants believed the modification satisfied the federal EFR requirements. (*Id.* ¶ 38.) On May 4, 2017, a planning technician with the County Department of Community Development ("Department") confirmed that he received the EFR Application and sent Crown Castle a site-improvement plan to redline and return. (*Id.* ¶¶ 40–41.)[2] On May 18, 2017, Crown Castle returned a redlined site improvement plan to Douglas County. (*Id.* ¶ 43.) Although it had submitted a complete application earlier, Defendants agreed to treat the 60-day shot clock as beginning on May 18, 2017, when the redlined site improvement plan was returned. (*Id.* ¶ 44.)

On June 22, 2017, Defendants met with staff from the County to discuss the Application. (*Id.* ¶ 45.) On June 29, 2017, the County sent Defendants a document with the heading "Presubmittal Review" containing comments on the Application.[3] (*Id.* ¶ 46.) The County specified that its "design standards for personal wireless communication facilities do not support

---

[2] *See also* Am. Countercl. ¶ 69 ("The Douglas County Department of Community Development acknowledged that it received the application materials, including the Application for Eligible Facilities Request."). Other than communicating by letter with the Assistant County Attorney when disagreement arose over whether the proposal would substantially change the existing structure, Defendants have not alleged that they had any contact with any County personnel or officials outside of the Department of Community Development ("Department"). Nor have they alleged any decision by that or any other department outside of the context of the singular application at issue here.

[3] While the County previously took the position that Defendants had not submitted a formal application before the June 22, 2017 review, it has changed course, and the parties now agree that the Application was submitted pursuant to the EFR process and complete by at least May 18, 2017. (*See, e.g.*, Compl. ¶¶ 54–57, ECF No. 1; Am. Countercl. ¶¶ 25–62.) However, because it takes the position that the proposed modifications would "substantially change" the existing structure, the County does not consider it to be a true EFR (*i.e.*, an *eligible* facilities request).

4

a 38 [inches] canister or pole diameter for this site," because "[a]n expansion to 38 [inches] no longer provides a stealth design" and that the "original cell site was approved and constructed as a stealth utility pole." (*Id.* ¶ 47.) The County suggested that "[s]ince the proposed design does not meet the approval standards, we recommend that you consider alternative designs or locations that can accommodate the increased antennas and other equipment in a stealth manner." (*Id.*) The County went on: "In this instance, the monopole is directly visible to the adjoining state highway and several surrounding residential and agricultural properties. A stealth windmill or silo design could be an appropriate choice for this location." (*Id.* at Ex. F, ECF No. 15-6, at 3.) While the document contains language indicating that Defendants could submit additional materials, the parties agree that the Application had been complete since May 18, 2017. (*Id.* ¶ 68.) Defendants maintain that this "Presubmittal Review" document was not a formal denial of the Application and an EFR. (*Id.* ¶ 48.)

On July 11, 2017, Defendants and the County exchanged e-mails regarding alternative designs, and the County reiterated its concerns with the Application as submitted. (*Id.* ¶¶ 52–53.) On October 24, 2017, counsel for T-Mobile sent a letter to the County explaining its position that the County's conclusions concerning the Application were incorrect. Specifically, T-Mobile argued that the modifications comprehended by the Application would not "substantially change the existing structure" within the meaning of federal law. (*Id.* ¶ 55, Ex. G.) That letter also stated that "it constitutes T-Mobile's response to" the "Presubmittal Review, requesting additional information." T-Mobile took the position that the "Presubmittal Review" was not a final decision, but it had instead tolled the 60-day shot clock, and "T-Mobile is therefore restarting the shot clock" with its provision of additional information. (*Id.* at Ex. G.)[4]

---

[4] While the October 24, 2017 letter represents itself as providing "additional information," the Court sees no such additional information contained therein other than additional argument in support of the same information and

5

On November 7, 2017, fourteen days later, the County sent a letter to Defendants reiterating its claim that the submittal would result in a substantial modification of the tower, and stating that the shot clock did not apply because T-Mobile submitted a "Presubmittal Review Request," not a formal EFR application. (*Id.* ¶ 58.)[5] This letter unequivocally iterates the County's position that Defendants' submission was not a valid EFR:

> What had appeared as an innocuous unused pole with nothing on it (thus the "stealth" designation) would change into what is clearly some sort of wireless communications facility with a large cylinder located at the top. Exasperating this proposed new condition is the location in a highly visible and trafficked urbanized area. This would clearly 'defeat the concealment elements' as contemplated in 47 C.F.R. § 1.40001(b)(7)(v) and is therefore a 'substantial change' that does not qualify for approval under 47 U.S.C. § 1455(a)(1).

(ECF No. 28-8.) On November 14, 2017, Defendants responded, taking the position that it had submitted an EFR subject to the shot clock and the County's presubmittal review process was unlawful. (*Id.* ¶ 59.) On December 1, 2017, Defendant sent the County another letter, in which it submitted that the shot clock had run on November 18, 2017, Defendants' Application was "deemed granted" as a matter of law, and Defendants intended to commence construction. (*Id.* ¶ 60–61.) The County did not issue a permit for Defendants' modification. (*Id.* ¶ 62.)

### B. Procedural Posture

On December 29, 2017, the County filed this action seeking declaratory relief, invoking the Court's federal question jurisdiction. (Compl., ECF No. 1.) Generally, the County asks this Court to confirm that it did, in fact, deny the Application; the Application is no longer subject to challenge; and that Defendants' letter notice that the Application is "deemed granted" is of no

---

      proposals contained in the original Application. (*Compare* Am. Countercl. Ex A *with id.* Ex. G.) While the letter may provide additional characterization of the previously submitted materials, it is incontrovertible that Defendants never provided any information concerning the proposal after May 18, 2017.

[5] *But see* note 2, *supra*.

legal effect. (Compl. at 23–24.) On January 23, 2018, Defendants answered and filed three counterclaims. (*See generally* Am. Countercl.) Counterclaim One alleges a violation of 47 U.S.C. § 1455, specifically that the County misinterpreted the act and failed to approve a proposal that would not allegedly effect a substantial change. (*Id.* ¶¶ 105–21.) Counterclaim Three alleges an illegal prohibition by the County of Defendants' ability to provide wireless services. (*Id.* ¶¶ 126–29.) Counterclaim Two alleges, *in toto*:

### COUNT TWO
### Violation of 42 U.S.C. § 1983

> 122. Applicants incorporate Paragraphs 1-104 above as if fully restated herein.
> 123. [47 U.S.C. § 1455] creates a federal right because it requires State and local governments to approve a wireless carrier's eligible facilities request.
> 124. Douglas County's Department of Community Development's failure to approve Applicants' Application constitutes an official action by Douglas County.
> 125. By failing to approve Applicants' Application, Douglas County has deprived Applicants of a right, privilege, or immunity secured by the Constitution and laws, specifically Section 6409, in violation of 42 U.S.C. § 1983.

(*Id.* ¶¶ 117–19.) The County moved to dismiss Counterclaim Two (*See generally* Motion; Reply, ECF No. 40) and Defendants opposed. (Response, ECF No. 35.) Magistrate Judge Neureiter considered the Motion and recommended that it be granted. (Recommendation, ECF No. 72.) The parties' have also filed cross-motions for summary judgment on all claims, including Counterclaim Two. (ECF Nos. 61, 62.) Those motions were fully briefed, and the magistrate judge has recommended that summary judgment be entered in favor of the County. (ECF No. 86.) Defendants filed an unopposed motion for an extension of time to file objections to the magistrate judge's report and recommendation, which this Court granted. (ECF No. 88.) Those objections are due April 2, 2019. (*Id.*)

## II. ANALYSIS

The Court reviews timely objections to a magistrate judge's recommendation *de novo*. Fed. R. Civ. P. 72(b)(3). At issue here is whether Counterclaim Two states a plausible claim upon which relief can be granted against the familiar (and difficult) showing required to invoke local government liability pursuant to 42 U.S.C. § 1983 set forth in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), and its progeny.

### A. Plausibility Pleading

The County argues that Count Two of the Counterclaim should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. The relevant legal inquiry on such a motion is ubiquitous and routine. A court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *Brokers' Choice of America, Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1135–36 (10th Cir. 2014). But a plaintiff must allege "plausible" entitlement to relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–556 (2007). Conclusory allegations are insufficient. *See Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009). The pleading must "nudge[ a plaintiff's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "In determining the plausibility of a claim, [courts] look to the elements of the particular cause of action." *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (citation, internal quotation marks, and alteration omitted). Of course, a court's analysis on a motion to dismiss is limited to the four corners of the pleading at issue, together with any incorporated attachments thereto. *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994); *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).

### B. Local Government Liability Under *Monell* and its Progeny

Section 1983 demands that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

In *Monell*, the Supreme Court enunciated the rule for imposing Section 1983 liability on a governmental entity: A plaintiff must identify "a government's policy or custom" that caused the injury. *Monell*, 436 U.S. at 694. In later cases, the Supreme Court required a plaintiff to show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury. *See Brown*, 520 U.S. 397, 403 (1997); *see also City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Thus, there are three elemental showings that a plaintiff must plausibly allege: (1) official policy or custom, (2) causation, and (3) state of mind. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769–70 (10th Cir. 2013). The Court will briefly discuss each in turn.

#### 1. Official Policy or Custom

In *Monell*, the Supreme Court found that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." 436 U.S. at 691. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that

9

municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original). A challenged practice may be deemed an official policy or custom for Section 1983 municipal-liability purposes if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision. *Schneider*, 717 F.3d at 770.

### 2. Causation

To establish the causation element, the challenged policy or practice must be "closely related to the violation of the plaintiff's federally protected right." *Id.* This requirement is satisfied if the plaintiff shows that "the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404. Defendants here must therefore "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* As with so-called supervisory liability discussed above, municipal liability in a Section 1983 case cannot be established on a theory of vicarious liability. "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405. "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." *Schneider*, 717 F.3d at 770.

### 3. State of Mind

"[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Brown*, 520 U.S. at 407; *see also City of Canton*, 489 U.S. at 389.

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction[.]

*Barney v. Pulsipher*, 143 F.3d 1299, 1307–08 (10th Cir. 1998) (internal citations omitted).

### C. Defendants have failed to allege facts that, even if true, plausibly support County liability.

As the Recommendation surmised, Section 1983 claims against a local government involve two showings. Assuming a plaintiff has a statutory right that may be enforced via Section 1983, to prevail, it must establish "that a municipal employee committed a constitutional violation [or violation of a federal right], and [ ] that a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Bd. of Cnty. Comm'rs of Oklahoma Cnty.*, 151 F.3d 1313, 1316 (10th Cir. 1998). In their initial briefing, the parties focused heavily on *Monell* liability, principally analyzing whether the Department is a final policymaker. But the Recommendation altered course, avoided *Monell*, and found that Section 1983 is not an appropriate vehicle for enforcement of limits on local authority to restrict telecommunication installations. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113

(2005) (holding that an individual could not enforce Telecommunications Act limitations on local zoning authority via Section 1983). (Recommendation at 9–10.) The Objection presents a thorough rebuttal to the magistrate judge's position, arguing that the remedial scheme at issue in *Abrams* that evidenced congressional intent to foreclose Section 1983 recovery with respect to the Telecommunications Act does not extend to the Spectrum Act, which contains no internal remedial structure. (*See generally* Objection.) However, despite this Objection, the Court need not decide whether Section 1983 is an appropriate enforcement mechanism for alleged violations of the Spectrum Act because Defendants have fallen woefully short of alleging *Monell* liability.[6]

Assuming that the Spectrum Act requires local governments to approve EFRs,[7] which invests Defendants with some "right" that was violated, Defendants make no claim whatsoever that this case involves an actual formally promulgated policy, well-settled custom or practice, or deliberately indifferent training regime of any violative practice. Counterclaim Two states only that the "County's Department of Community Development's failure to approve Applicants' Application constitutes an official action by Douglas County." (Am. Countercl. ¶ 124.). As restated in the Response, Defendants argue only that "[b]ecause [the Department] designed the process for reviewing eligible facilities requests and is the sole body responsible for reviewing these requests, the staff are final policymakers for Douglas County, and the County is therefore responsible for their actions." (Response at 4.) This threadbare conclusion is not supported by any well-pleaded allegations.

---

[6] In its response to the Objection, the County argued both that (1) Section 1983 is not an appropriate enforcement mechanism and (2) Defendants have not pleaded a claim for governmental liability under *Monell*. (*See generally* Objection Response.)

[7] The definition of an "eligible facilities request" pre-supposes that such a proposal will not "substantially change" an existing fixture. 47 U.S.C. § 1455(a)(2); 47 C.F.R. § 1.6100(b)(3). While the parties clearly disagree as to whether the Application was a true EFR, the Court assumes that the County is required to approve EFRs.

Initially, the Court notes that Defendants' reformed argument that the Department "designed the process" at issue here appears only in the Response, and Defendants have no business polluting otherwise insufficient allegations with *ex post* briefing argument. Looking only to the Amended Counterclaim, and not beyond, the Court can find no allegations that even describe the Department's authority, operations, conduct, practices, procedures, or customs. Defendants do nothing to nudge their unadorned conclusion that the Department is a final policymaker from conceivable to plausible.

But assuming that Defendants were permitted to salvage Counterclaim Two with additional explication, they misapprehend entirely the "final policymaker" theory of governmental liability elucidated by the Supreme Court. In *Pembaur*, the Court established that actions taken by a municipality's final policymakers may give rise to municipal liability, but only insofar as those acts were fairly equivocal as acts of the governmental institution itself. The Court held "that municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 469. "The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Id.* at 481–83. Going deeper, the Court made clear that "whether an official had final policymaking authority is a question of state law." *Id.* at 483. The Tenth Circuit has identified three factors to consider when deciding whether someone has final policymaking authority: "(1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decisions are final—*i.e.*, are they subject to any meaningful review; and (3) whether the policy decision purportedly made

by the official is within the realm of the official's grant of authority." *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995).

Taking the allegations in the Amended Counterclaims to be true, the Court is only plausibly convinced of one fact—namely, that the Department had some degree of autonomy to determine, upon submission of an EFR application, whether the proposal contained therein would substantially change an existing structure. But as stated in *Pembaur*, the existence of that discretion, without more, is not enough to confer upon a government liability for the isolated actions of its employees. Moreover, as the County correctly points out, and the Amended Complaint conveniently omits, the Department's decisions are not final. Under Colorado law, the County is required to provide for a Board of Adjustment to hear appeals of any Department decisions. Colo. Rev. Stat. Ann. § 30-28-117(1); *see also* Colo. Rev. Stat. Ann. § 30-28-118(1)(a) ("Appeals to the board of adjustment may be taken by any person aggrieved by his inability to obtain a building permit or by the decision of any administrative officer or agency based upon or made in the course of the administration or enforcement of the provisions of the zoning resolution.").

Finally, the allegations in the Amended Counterclaim severely undermine a showing that the County or Department acted with deliberate indifference to an almost certain violation of Defendants' rights. There is no question that denying EFR applications containing proposals that would cause substantial change is a facially lawful endeavor. Defendants' pleading, if true, suggest that the County extended itself beyond the call in order to assist Defendants in complying with its restrictions by building a proper EFR application. Moreover, the County was not at all sluggish in its responses to Defendants or cryptic in its reasoning. In fact, arguably, it is Defendants, not the County, who are to blame for any indifference to what they believe is their

right. Again, arguably, the County isn't to blame for Defendants' choice to sleep on this issue for many months. In any event, County indifference has not been adequately pleaded.

## III. CONCLUSION

Counterclaim Two provides too little and Defendants' arguments in support of it go too far. To allow Counterclaim Two to move forward would forsake *Monell* and its progeny to confer *respondeat superior* liability upon the County for the isolated decision of a single actor on a single occasion. Therefore, the Court does not need to address the main thrust of the Recommendation. The Court **ADOPTS**, in result only, the Recommendation (ECF No. 72) and **GRANTS** the Motion (ECF No. 30). Amended Counterclaim Two is **DISMISSED** with prejudice.

DATED this 26th day of March, 2019.

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge