**IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico**

Case No. 18-cv-03171-DDD-NRN

BOARD OF COUNTY COMMISSIONERS FOR DOUGLAS COUNTY,
COLORADO,

      Plaintiff/Counter-Defendant,

v.

CROWN CASTLE USA, INC., and
T-MOBILE WEST LLC,

      Defendants/Counter-Plaintiffs.

---

## AMENDED ORDER[1]

---

    This case presents a novel application of the age-old friction between technological advances and aesthetic preferences. The defendants, to help satiate their customers' increasing demand for wireless bandwidth, seek to improve an existing cellular transmission tower they own and operate in Douglas County, Colorado. They would do so by adding slightly larger antennas and other equipment covered by a metal cylinder at the top of their existing pole, which they claim would essentially look like a cap on a pen. Douglas County opposes this effort because its approval of the original pole was conditioned on its being made to resemble an old fashioned, yet unadorned utility pole, but, the County

---

[1]   This Amended Order replaces the Court's original Order of September 9, 2019 (Doc. 101), which has been withdrawn pursuant to the Court's Order on Plaintiff's Rule 59(e) Motion to Alter or Amend Judgment.

says, the proposed alterations would make the tower look like "a marsh-mallow on a stick."

The issue before the Court, however, is not which of these similes it finds most apt.[2] Congress has passed statutes and the Federal Communications Commission has enacted a regulation ("the Rule") that seeks to address the very sort of tension between improved wireless infrastructure and local control this case exemplifies. The Rule provides that local governments must approve requests to make certain types of improvements to certain types of wireless facilities in an expedited process. The question here is whether this is such a request. The Court concludes that it is not and agrees with the Magistrate Judge's conclusion that summary judgment be granted in favor of Douglas County.

## I.    BACKGROUND

The defendants and counterclaimants here are T-Mobile West LLC and a facilities infrastructure company named Crown Castle USA, Inc.[3] The cellular tower in question is in Castle Rock, Colorado, a fast-growing area outside of Denver. In May 2017, Crown Castle sought the county's approval to make alterations to the tower. The County did not approve that request, but after a few months of back and forth, which will be discussed in detail below, Crown Castle informed the County that it believed it was legally entitled to improve the tower nonetheless. The County then brought this suit seeking to block the changes, and Crown Castle counterclaimed. Both parties have filed competing motions for summary judgment (Docs. 61, 62), which have been fully briefed, as have

---

[2]    Based on its review of the evidence submitted by both parties, the Court, in all candor, is not especially impressed by either of them.

[3]    Unless otherwise noted, the Court will refer to the defendants collectively as Crown Castle.

objections to the magistrate judge's Report and Recommendation on those motions.[4]

## A.    The Spectrum Act and Its Implementing Regulations

Under the Supremacy Clause of Article VI of the United States Constitution, valid federal law and regulation preempts contrary state and local enactments. *See Colo. Dep't of Health & Env. v. U.S.*, 693 F.3d 1214 (10th Cir. 2012). The County here does not dispute that if federal statute or rule gives Crown Castle the right to make their proposed changes, any contrary county requirements must give way. The Court therefore begins with a brief overview of the applicable law before turning to the facts and procedural posture.

Governing federal law permits, but limits, a local government's control over modifications to wireless facilities, including its ability to deny applications to construct those modifications. *See* 47 U.S.C. § 1455 ("Spectrum Act"); *see also* 47 U.S.C. § 332. "[A] State or local government may not deny, and shall approve, any eligible facilities request ["EFR"] for a modification of an existing wireless tower or base station that does not substantially change the physical dimensions of such tower or base station." 47 U.S.C. § 1455(a)(1).

The FCC's implementing regulations require a local government to approve EFR applications within 60 days of their submission. 47 C.F.R. § 1.6100(c)(2).[5] The 60-day period, colloquially referred to as a "shot

---

[4]    This matter was reassigned to Judge Daniel D. Domenico on July 12, 2019. (Doc. 98.)

[5]    The parties' briefing cites these regulations as 47 C.F.R. § 1.40001, which was later re-designated as 47 C.F.R. 1.6100. *See* 83 FR 51886 (Oct. 15, 2018).

clock," may only be tolled by mutual agreement between the local government and applicant or if the local government determines that the application is incomplete. 47 C.F.R. § 1.6100(c)(3). If an application is incomplete, the local government must provide written notice of that circumstance, including what information is missing, within 30 days of the application submission. 47 C.F.R. § 1.6100(c)(3)(i). When the applicant submits supplemental information, the shot clock resumes running, and the local government has 10 days to notify the applicant of any remaining deficiencies. 47 C.F.R. § 1.6100(c)(3)(ii)–(iii).

If a local government fails to timely approve or deny an EFR, "the [EFR] shall be deemed granted. The deemed grant does not become effective until the applicant notifies the applicable reviewing authority in writing after the review period has expired (accounting for any tolling)." 47 C.F.R. § 1.6100(c)(4). Applicants subject to adverse decisions by local governments may bring claims related to this process in any court of competent jurisdiction within 30 days of such decision. 47 U.S.C. § 332(c)(7)(B)(5); 47 C.F.R. § 1.6100(c)(5).

## B.    Facts

T-Mobile provides wireless services to businesses and the general public. Am. Countercl. ¶¶ 16, 19 (Doc. 28). Crown Castle owns, operates, and maintains an infrastructure network, which its customers, including T-Mobile, use to situate facilities that provide these wireless services. *Id.* ¶ 14. A wireless facility serves a particular geographic area and normally consists of several antennas, which may be attached to a tower, monopole, or other structure in public right-of-way or private utility easements. *Id.* ¶¶ 20–21. T-Mobile must periodically upgrade and modify its existing facilities using new technologies and adding new spectrum bands as authorized by the FCC. *Id.* ¶ 23.

4

The County provides a form for submitting EFRs. *Id.* ¶ 32. On April 27, 2017, Crown Castle, on behalf of T-Mobile, submitted an EFR application to the County to modify a communications tower located in Castle Rock, Colorado. Plaintiff's Ex. 7 (Doc. 63-8). That tower is a monopole and uses concealment panels to hide the antennas and associated equipment from view. The tower is of a "stealth" design, which means, according to the County, that it is disguised to resemble something other than a cellular antenna tower, in this case a regular, unadorned utility pole.

The Defendants' application proposed to modify the tower by replacing and adding facilities that would expand the concealment shroud from 18 inches to 38 inches wide and from 10 feet to 11 feet high—increasing the height of the tower from 35 feet to 36 feet. *See id.* at p. 7. Following the modification, the tower would still use concealment panels to hide the antennas and associated equipment from view. Am. Countercl. ¶¶ 30–31 (Doc. 28). Thus, the only visible changes would be the increased size of the upper portion of the tower in which the antennas and other equipment is housed.

The application included a cover letter, project narrative, photo simulation, preliminary drawings, structural analysis, an application fee, and letters of authorization from the tower and land owners. *See* Plaintiff's Ex. 7 (Docs. 63-8 & 63-9). Crown Castle completed its application on May 18, 2017. Accordingly, the parties treated the 60-day shot clock as beginning on May 18, 2017 *See, e.g.*, Compl. ¶¶ 54–57 (Doc. 1); Am. Countercl. ¶¶ 25–62 (Doc. 28).

On June 22, 2017, Defendants met with staff from the County to discuss the application. Plaintiff's Ex. 1, ¶¶ 31, 32 (Doc. 63-1). One week later, the County sent Defendants a document entitled "Presubmittal Review" containing comments on the application. Plaintiff's Ex. 12 (Doc.

63-14). The document stated that the County's "design standards for personal wireless communication facilities do not support a 38 [inch] canister or pole diameter for this site," because "[a]n expansion to 38 [inches] no longer provides a stealth design" and the "original cell site was approved and constructed as a stealth utility pole." *Id.* at 2. The County suggested that "[s]ince the proposed design does not meet the approval standards, we recommend that you consider alternative designs or locations that can accommodate the increased antennas and other equipment in a stealth manner." *Id.* at 3. The County continued: "In this instance, the monopole is directly visible to the adjoining state highway and several surrounding residential and agricultural properties. A stealth windmill or silo design could be an appropriate choice for this location." *Id.*

On October 24, 2017, counsel for Crown Castle responded by letter explaining its position that the County's conclusions were incorrect. Specifically, the letter argued that the proposed modifications would not "substantially change the existing structure" within the meaning of federal law. Defendant's Ex. G (Doc. 28-7). That letter also stated that "it constitutes T-Mobile's response to" the "Presubmittal Review, requesting additional information." T-Mobile took the position that the "Presubmittal Review" was merely a request for additional information that tolled the 60-day shot clock, and "T-Mobile is therefore restarting the shot clock" with its provision of additional information. *Id.*

On November 7, 2017, the County sent a letter to the Defendants reiterating its view that the submittal would result in a substantial modification of the tower, and stating that the shot clock did not apply because T-Mobile submitted a "Presubmittal Review Request," not a formal EFR application. Defendant's Ex. H (Doc. 28-8). This letter clarified

the County's position that Defendants' proposed modification would alter the concealment elements of the original design:

> What had appeared as an innocuous unused pole with nothing on it (thus the "stealth" designation) would change into what is clearly some sort of wireless communications facility with a large cylinder located at the top. Exasperating [sic] this proposed new condition is the location in a highly visible and trafficked urbanized area. This would clearly "defeat the concealment elements" as contemplated in 47 C.F.R. § 1.40001(b)(7)(v) and is therefore a "substantial change" that does not qualify for approval under 47 U.S.C. § 1455(a)(1).

*Id.* The Defendants responded a week later, taking the position that it had submitted an EFR subject to the shot clock and the County's pre-submittal review process was unlawful. Defendant's Ex. I (Doc. 28-9). On December 1, 2017, Defendants sent the County another letter, in which it submitted that the shot clock had expired on November 18, 2017, that Defendants' Application was "deemed granted" as a matter of law, and that Defendants intended to commence construction. Defendant's Ex. J (Doc. 28-10).

On December 29, 2017, the County initiated this action seeking declaratory relief, claiming that the Defendants' Deemed Grant Letter was void and that the Defendants had waived the right to challenge the County's actions ("Timing Matters"). The County also sought, in the alternative, a declaration that the Defendants' proposed modification to the cell tower constitutes a "substantial change to the physical dimensions" within the meaning of 47 U.S.C. § 1455(a)(1). (*Id.*)

The Defendants, in turn, filed three amended counterclaims (Doc. 28, at 13–30). They claim that: (1) the proposed modification is not a "substantial change"; (2) the County's failure to approve the Defendants' application deprived them of their legal rights in violation of 42 U.S.C. § 1983; and (3) the County's failure to approve the application effectively prohibited the provision of wireless services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II).

## C.    Procedural Posture and Standard of Review

The parties filed competing summary judgment motions on all claims, which were referred to Magistrate Judge Neureiter. (Doc. 66.) Judge Neureiter considered the motions, held oral arguments, and issued a report and recommendation that urged granting the County's motion for summary judgment and denying Defendants' motion.[6] (Doc. 86.) The Defendants filed timely objections. (Doc. 92.) "The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3).[7]

---

[6]    The County moved to dismiss the Defendants' section 1983 counterclaim. (Doc. 30.) That motion was granted after the parties completed their summary judgment briefing. (Doc. 90.)

[7]    The County argues that de novo review is not required because Defendants' objection merely "rehashes" their summary judgment briefing and therefore Judge Neureiter's disposition was not "properly objected to." Plaintiff's Resp. at 3 (Doc. 97). While objections that simply reiterate the underlying arguments and fail to address the specifics of the magistrate judge's disposition may not be entitled to de novo review, *e.g.*, *Vester v. Asset Acceptance, L.L.C.*, 08-cv-01957-MSK-LTM, 2009 WL 2940218, at *8 (D. Colo. Sept. 9, 2009), this is not such a case. Defendants' objections are quite detailed and certainly "'specific enough to enable [the Court] to focus attention on those issues—factual and legal— that are at the heart of the parties' dispute.'" *Cheavens v. Public Serv. Corp.*, 176 F. Supp. 3d 1088, 1091 (D. Colo. 2016) (quoting *United States v. One Parcel of Real Prop. Known as 2121 East 30th St.*, 73 F.3d 1057, 1059 (10th Cir. 1996)).

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Adamson v. Multi Community Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). A fact is material if it could affect the outcome of the suit under governing law; a dispute of fact is genuine if a rational jury could find for the nonmoving party on the evidence presented. *Id.* If no reasonable juror could return a verdict for the nonmoving party, summary judgment is proper. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The parties here have both conceded that there are no material factual disputes, and that the questions before the Court are purely legal. (Doc. 63.) Summary judgment therefore is an appropriate means of resolving the case.

### B. Timing Matters

#### 1. Whether the County's "Presubmittal Review" Constituted a Denial of Defendants' Application

The County argues that it denied the Defendants' application in June 2017, and that, pursuant to the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7)(B)(v), Defendants had 30 days in which to challenge the County's denial in court. (Doc. 62, at 12.) Defendants did not file an action within that timeframe, and the County therefore contends that Defendants have forfeited their right to do so.[8] Compl. ¶ 6 (Doc. 1). The Court disagrees.

---

[8] And because a deemed granted right is only available if a local government fails to act, not if it has denied an application, 47 C.F.R. § 1.6100(c)(4), if the County is correct about this the deemed granted letter would be invalid and the denial would stand.

The County correctly points out that by June 29, 2017, its staff had expressed to Crown Castle that its application was not going to be approved. *See* Pls. Ex. 12 (Doc. 63-14, at 3) ("Since the proposed design does not meet the approval standards, we recommend that you consider alternative designs or locations that can accommodate the increased antennas and other equipment in a stealth manner."). The Court agrees that this was a clear statement that the County's zoning staff would not approve the application in its current form, but it does not agree that this constitutes a denial that triggers the 30-day deadline.

The County's response to Crown Castle's application, which the County styled as a "Presubmittal Review," does not contain any form of the word "deny." At most, it appears to be an invitation to Crown Castle to consider alternative designs and amend and resubmit its application. *See id.* at 2 ("This Presubmittal Review is intended primarily to identify the appropriate process; compliance with applicable regulations will be evaluated throughout the application review process."). Perhaps even more telling, the County has a form specifically designed to either deny or approve applications, but chose not to use it in responding to Crown Castle's application. That form, entitled "Eligible Facilities Request Determination," Plaintiff's Ex. 7, at 8 (Doc. 63-8), contains two optional boxes for the decision maker to check. Next to the first box is the statement: "This project has been determined to meet the definition of an Eligible Facility and is deemed approved as of _____ (date)." *Id.* at 9. The second option states: "This project exceeds one or more of the Eligible Facility thresholds as noted below. The request is a substantial change and is not approved as of _____ (date)." *Id.* The County's failure to utilize that form, but instead to communicate less formally, illustrates that its Presubmittal Review was not a denial.

The Court holds that the County did not deny Defendants' application in June 2017 and therefore Defendants did not fail to timely seek relief. Judge Neureiter's Report and Recommendation concluded otherwise. He found it telling that did not provide an affidavit expressing confusion or doubt about whether the "Presubmittal Review" was a denial. (Doc. 86 at 28.) This Court finds it far more telling, however, that the County chose not to send Defendants a form whose explicit purpose is the approval or denial of an EFR application.

The Report and Recommendation cites *T-Mobile South, LLC v. City of Roswell*, 574 U.S. 293 (2015), for the proposition that the specific words "deny" or "denial" need not be used to communicate the denial of an application. That is so, but does not alter the conclusion here. The holding in *T-Mobile South* was that (1) a locality must give reasons to support its denial of an application, and (2) the reasons need not necessarily appear "in the same writing that conveys the locality's denial of an application." *Id.* at 815. Implicit in the Court's holding is the notion that the locality, at some point, must actually "convey[] the . . . denial of an application." *Id.* As discussed above, the County did not convey to the Defendants that their application had been denied. It clearly did not approve the application, but neither did it deny it.[9] The letter thus did not trigger Section 332's timeline.

---

[9] Judge Neureiter also noted that at oral argument, Defendants' counsel admitted that "[i]t is clear . . . that the County believes that this is not properly filed as an EFR. I completely agree that that is an accurate statement of what staff's opinion was." As Defendants have pointed out, however, counsel stated in the very next sentence, "Nothing in this document [*i.e.*, the "Presubmittal Review"] says this is a final determination by staff that this is a denied application, and that's the point that I think is critical—it's subtle, but [the] critical difference between the two things we're talking about."

### 2. The effect of the Deemed Grant letter

As described above, the parties engaged in a lengthy back and forth in the summer and fall of 2017 before Crown Castle ultimately sent a Deemed Grant Letter on December 1 of that year. The parties and the Recommendation spent a significant amount of their time disputing the propriety of that letter at that time, but it is ultimately of little import to the disposition of this case.

The Report and Recommendation concluded that the Deemed Grant Letter "appears to have been a bullying tactic to force Douglas County into court as the Plaintiff bearing the burden of proof when, for its part, Douglas County had acted in a timely and appropriate fashion all along." (Doc. 86 at 33). The Court does not disagree that the County acted appropriately; it appears that it followed relatively routine procedures for a local planning department. But particularly given the Court's conclusion that the County had not denied the application, the Court agrees with Crown Castle that the Deemed Grant Letter, rather than a bullying tactic, is simply the means provided by the Rule for an applicant to move the process along. *See* 47 C.F.R. § 1.6100(c)(4) ("In the event the reviewing State or local government fails to approve or deny a request seeking approval under this section within the timeframe for review (accounting for any tolling), the request shall be deemed granted."); *In the Matter of Acceleration of Broadband Deployment by Improving Wireless Facilities Siting Policies*, FCC 14-153 ("2014 Order") ¶ 227. ("[T]he text of Section 6409(a) supports adoption of a deemed grant remedy, which will directly serve the broader goal of promoting the rapid deployment of wireless infrastructure.").

In light of the Court's holding that the County's "Presubmittal Review" was not a denial of the Defendants' application, the 60-day shot

clock set forth in 47 C.F.R. § 1.6100(c)(2) continued to run. The regulation allows the shot clock to be tolled if the parties mutually agree to tolling or if the locality determines that the EFR application is incomplete, but there is no evidence in the record of either of those circumstances. Accordingly, the deadline for the County to approve or disapprove of the Defendants' application expired on July 17, 2019—60 days after the Defendants completed their application.[10]

The application was therefore deemed granted as of December 1, 2017, when Defendants advised the County of their view that the review period had expired. 47 C.F.R. § 1.6100(c)(4) ("The deemed grant does not become effective until the applicant notifies the applicable reviewing authority in writing after the review period has expired (accounting for any tolling) that the application has been deemed granted."). The County argues that Crown Castle had 30 days from the expiration of the 60-day period in which to challenge the County's failure to act either in court or with a deemed grant letter. Plaintiff's Motion, at 13-14 (Doc. 62). That is not how the deemed grant provision operates. The regulation does not specify a deadline by which an applicant must send a deemed grant letter after expiration of the 60-day shot clock. The FCC has stated that the "relevant event" triggering the 30-day deadline is "the date of the denial of the application or the date of the notification by the applicant to the state or local authority of a deemed grant in accordance with our rules . . ." 2014 Order ¶ 236. There having been no denial, the relevant

---

[10] The County argues that it subsequently sent a letter in November 2017 "reiterating" that the Defendants' application had been rejected. As discussed above, however, the County's "Presubmittal Review" was not a denial as a matter of law. Since the County sent the November 2017 letter more than three months after the expiration of the 60-day period, it was of no effect.

event was the Deemed Grant Letter, twenty-eight days after which Douglas County brought this suit.[11]

It is true this forces the local government to file the case as the plaintiff, which means they carry the burden of proof. But in this case the parties have agreed that the issues are purely legal, so that is of little practical import. While the phrase "deemed granted" could suggest that the effect of such a letter is binding and not subject to review, which would be significant indeed, that does not appear to be the case. *See id.* ¶ 231 ("[A] State or local authority may challenge an applicant's written assertion of a deemed grant in any court of competent jurisdiction when it believes the underlying application did not meet the criteria in Section 6409(a) for mandatory approval."). Instead, it appears Crown Castle is correct that the main effect of a deemed grant letter is purely procedural, a way for the applicant to "mark the culmination of the application process" when there has not otherwise been a final approval or denial by the locality. (*See* Doc. 92 at 20.) Thus, the letter had no effect other than to force the County to decide whether to sue to block the changes to the tower. They did, and the Court now turns to the merits.

## B. Whether Defendants' Application was a Valid EFR

The Spectrum Act was "designed to encourage the growth of a robust national telecommunications network." *Montgomery County v. Federal*

---

[11]   The County has never argued that its actions between June and November 2017 should be considered a "failure to act," and so the Court need not consider whether that clause of § 332 might have been triggered at some point prior to the filing of this suit. Even so, it would seem that the best reading of the statute in these circumstances is that since an applicant whose valid application a government has failed to act upon has the right to the deemed granted remedy, they cannot be "adversely affected" by a failure to act until their exercise of that remedy is challenged.

*Communications Comm'n*, 811 F.3d 121, 124-25 (4th Cir. 2015). It does so in part by preventing local governments from unduly delaying relatively minor modifications to existing cellular facilities. In particular, it specifies that local governments "may not deny, and shall approve, any eligible facilities request for a modification of an existing wireless tower . . . that does not substantially change the physical dimensions of such tower . . . ." 47 U.S.C. § 1455(a)(1).

The Act does not define what constitutes a "substantial change" to the "physical dimensions" of a tower, but FCC regulation provides that a proposed modification "substantially changes the physical dimensions" of an existing tower if it adds more than 10 percent or more than ten feet to the height (whichever is greater) or adds an appurtenance wider than 20 feet. 47 C.F.R. § 1.6100(b)(7)(i–ii). The parties agree that Defendants' proposed cell tower modification did not exceed these limits.

In addition to defining the physical dimensions of a "substantial change," however, the FCC's regulation also states that a modification "substantially changes the physical dimensions" of a tower if "[i]t would defeat the concealment elements of the eligible support structure." 47 C.F.R. § 1.6100(b)(7)(v). The core question in this case, then, is whether the Defendants' proposed expansion of the canister at the top of the structure defeats the "concealment elements" of the tower. The County can prevail on that question if three propositions are true:

1. The Rule's concealment element clause and size limit clauses must each be satisfied, rather than just one or the other,

2. The height and width of the original pole are "concealment elements" under the Rule, and

3. The proposed alterations would defeat those elements.

15

The Rule is less than clear in certain respects. It provides no definition for any of the operative words here (concealment, elements, defeat), for example. But as to the first proposition here, the text of the Rule specifies that each of the clauses in subsection (7) of the Rule are independent and separate criteria that cannot be violated in order to qualify for mandatory approval. *See* 47 C.F.R. § 1.6100(b)(7) ("A modification substantially changes the physical dimensions of an eligible support structure if it meets *any* of the following criteria:") (emphasis added)). Although as explained below some of its arguments implicate this proposition in certain circumstances, Crown Castle does not directly contest that in general the size and concealment elements must both be satisfied to qualify as an EFR.

As noted, neither rule nor statute defines "concealment elements" and the Court has not found or been pointed to any cases that do. The relevant dictionary definition of "concealment" is:

- "The action or an act of keeping something secret or hidden from knowledge."

and the relevant definition of "conceal" is:

- "To keep the nature or identity of (a person or thing) secret; to disguise."

Oxford English Dictionary (3d ed. 2015).

"Element" is defined as:

- "A component part of a complex whole";
- One of the facts or conditions which 'enter into' or determine the result of a process, calculation, deliberation, or inquiry."

*Id.*

The Court holds that "concealment elements" as used in subsection (7) of the Rule include those specific, objective conditions or requirements placed on a facility in order to help it blend in with surroundings or otherwise appear to be something other than a wireless transmission facility. The parties and the Recommendation spend a significant amount of time discussing what the proposed pole will look like. *See, e.g.*, Recommendation at 24–27 (Doc. 86). But based on this definition of "concealment elements," the Court agrees with Crown Castle that the case cannot turn on either the County's or a judge's assessment of whether the proposed facility looks enough like the rest of the utility poles in the area to blend in. That is the *goal* of the concealment elements, but it is not an element itself. "Concealment elements" then does not include the overall appearance of the structure, or what it is meant to "look like," but only the particularized conditions or steps that were imposed in order to attempt to achieve "concealment." This definition is not only consistent with the plain meaning of the text but also the regulatory structure and the FCC's justification for the Rule.[12]

---

[12] As far as the Court has discovered, only one federal decision has addressed the regulations at issue here. While not directly on point, it supports this understanding of the text. In *Montgomery County, Md. v. FCC*, 811 F.3d 121 (4th Cir. 2015), a coalition of local governments challenged the FCC's adoption of the regulations. The plaintiffs contended that "the term 'substantial' . . . is not amenable to the objective standards the FCC has used, but instead requires a contextual inquiry." *Id.* at 130. The court rejected the plaintiff's argument, "given that the provision at issues addresses 'physical dimensions.' It was not unreasonable for the FCC to supply a strictly numerical definition of substantiality in this context, because the physical dimensions of objects are, by their very nature, suitable for regulation through quantifiable standards." *Id.* Although the decision does not specifically address the concealment elements provision, the Court finds in the Fourth Circuit's reasoning some support for an objective approach to the "concealment elements" provision.

The use of the word *elements* is particularly telling here. Had the FCC meant to include a more generalized overview of the appearance of a facility, it could have simply dropped the word "elements" entirely and the Rule would apply to any change that defeats the "concealment" of the facility. Or, it could have used the somewhat more common concept of the "stealth tower." *See, e.g., Alta Towers, LLC v. City of New Braunfels*, No. 5:16-CV-00726-XR, 2017 WL 2703585, at *5 (W.D. Tex. June 22, 2017) ("Dictionary.com provides that a stealth tower is 'any telecommunications tower that is disguised or hidden to blend in with nature or structures.'"). Instead, the Rule requires focusing on the *elements* used to achieve concealment and stealth.

That those elements are specific, objective requirements such as size, shape, color, faux tree branches is supported by the FCC's justification for the rule. *See* 2014 Order ¶ 200 (noting that commenters "generally agree that a modification that undermines the concealment elements of a stealth wireless facility, such as painting to match the supporting façade or artificial tree branches, should be considered substantial"). A more subjective, big-picture review of the appearance would also be contrary to the FCC's explicit rejection of local government commenters' desire for subjective and "context-specific" rules. *See, e.g., id.* at 227 (the statute's "directive leaves no room for a lengthy and discretionary approach"); ¶¶ 183-88 (describing different approaches, and stating, "we adopt an objective standard for determining when a proposed modification will 'substantially change the physical dimensions' of an existing tower or base station"); ¶ 189 ("We initially conclude that we should adopt a test [for what constitutes a substantial change] that is defined by specific, objective factors rather than . . . contextual and entirely subjective standard[s] . . . ."); ¶ 232 (noting that local governments "must

determine, on a non-discretionary and objective basis, whether an application fits within the parameters of Section 6409(a)").

So, a generalized desire that the pole look like a utility pole or blend in with its surroundings is not, in itself, a concealment element under the Rule. But by the same token, the undisputed facts in this case make it clear that the limitations on height and width on the original pole imposed as part of the original approval process *are* concealment elements. From the start of that process to the end, the County insisted that the pole be made to look as much like existing utility poles in the area as possible. *See* Plaintiff's Ex. 1, at ¶¶ 15-17 (Doc. 63-1); Plaintiff's Ex. 4, at 1 (Doc. 63-4).[13] The means of doing so (which is to say, the concealment elements) included the shrouding of the antennas, the mandated paint color, and the height and width of the pole. There is no explanation for why the 35-foot height and 18-inch width limits were included in the approval documents other than to help match other utility poles in the area, which was the clear concern of the original siting approval process. In other words, the only apparent reason those particular elements were included in the approval was to aid in the concealment of the facility. They are, by definition then, concealment elements, which would be defeated by Crown Castle's proposed modification to expand the width of the concealment shroud and increase the height of the pole.

---

[13] In their summary judgment briefing, Defendants argued these documents were not properly disclosed and therefore should not be considered. Judge Neureiter rejected the argument (Doc. 86 at 8-9), and Defendants have not raised the argument in their objections. Accordingly, the Court reviews Judge Neureiter's analysis of this argument for clear error. Fed. R. Civ. P. 72(b), Advisory Committee Notes. The Court determines that Judge Neureiter's analysis was correct, and therefore adopts it.

Crown Castle makes both specific and general arguments against this conclusion. The specific arguments are that the documents do not show that the facility was required to "match" existing poles or state that that it was approved because it included any particular stealth criteria. (*See* Doc. 69 at 3-5, 9.) These are beside the point. As explained above, the question is whether the limits on height and width are among the specific "facts or conditions" imposed as part of the concealment design that the County demanded and the Defendants agreed to. While it may be a wise practice going forward for parties building such facilities to clearly label any "concealment elements," there was no reason to do so before the passage of the Spectrum Act and adoption of the Rule. And neither of those requires such explicit specification of concealment elements even now, let alone looking back.

Crown Castle's general point is more significant. The heart of its argument is that "if the exact dimensions of a structure could themselves be concealment elements, then *no* change to the physical dimensions of the structure would qualify as an EFR." (Doc. 69 at 5). This, it says, would effectively "write the word 'substantially' out of the statute and deprive it of all meaning." *Id*. This argument is not without some merit. The statute in question is, as modern federal statutes go, surprisingly simple, stating merely that a local government must approve any request "for a modification of an existing wireless tower or base station that does not substantially change the physical dimensions of such tower or base station." 47 U.S.C. § 1455(a). This seems to have been a bit too simple for the FCC, and so the implementing regulations include the various provisions outlined above, among others, along with the accompanying 155-page, 290-paragraph 2014 Order.

As Crown Castle notes, the statute speaks only of "substantial changes" to a facility's "physical dimensions," and the Rule then sets explicit limits on what it deems substantial changes in the physical size of an EFR. *See* 47 C.F.R. 1.6100(7)(i)-(iii). At least at first glance, it would seem to stretch the statute's language to impose additional restrictions on changes that impact concealment elements when the Rule elsewhere has already stated what the FCC has determined is a substantial change in physical dimensions.

Nevertheless, the Court does not agree with Crown Castle that this means the concealment elements clause cannot be applied in this case. First, to the extent the Defendants believe that the concealment elements clause is outside the statutory authorization, they have not argued that it is invalid in general or as applied.[14] The Court therefore proceeds on the assumption that the Rule as written is valid. Second, the Court does not agree that recognizing that size limits can also be concealment elements means that *no* change to a structure's physical structure will ever qualify as an EFR such that "substantially" is effectively written out of the statute. For one thing, only a subset of facilities are "stealthy" at all, and only a further subset of those will include strict size limitations among their concealment elements. It is only in that sub-subset of structures whose size is a significant part of their camouflage that this issue would arise.

But within that category, there can be little doubt that the Rule is meant to exclude changes to concealment elements from the mandatory

---

[14]   Indeed, Defendants reluctantly recognize that the non-size requirements, such as paint color and a shroud covering the antennas, are concealment elements. Defendants' S.J. Resp., at 4 (Doc. 69). Yet it is even harder to find the statutory justification for such things, which have an even more tenuous connection to the facility's "physical dimensions."

approval provisions, even if they would otherwise be within the general size limits. As explained above, the Rule's plain language requires compliance with both provisions. If there were doubt, 47 C.F.R. 1.6100(7)(vi) of the Rule should dispel it. There, the FCC addressed other conditions on approval—that is, conditions that are *not* concealment elements. The FCC required compliance with such other, non-concealment related conditions put on the initial site approval, just as it did with concealment elements. But tellingly, for those non-concealment conditions, the FCC explicitly wrote into the subsection an exception for changes that comply with the Rule's other height and width limitations. *See* Rule at (7)(vi); *see also* 2014 Order at ¶ 200 ("[W]e agree with municipal commenters that a change is substantial if it violates any condition of approval . . . unless the non-compliance is due to an increase in height, increase in width, addition of cabinets, or new excavation that does not exceed the corresponding "substantial change" thresholds we identify above."). This is precisely what Crown Castle asks the Court to read into the concealment elements provision, but the Court is not inclined to do so when the FCC chose to apply it only to other conditions.[15]

As a matter of statutory interpretation, the FCC appears to have concluded that what constitutes a "significant change" in physical dimensions is different for "stealth" facilities than for others. *See* 2014 Order at ¶ 200 ("We agree with commenters that in the context of a modification request related to concealed or 'stealth'-designed facilities—*i.e.*, facilities designed to look like some feature other than a wireless tower or base station—*any* change that defeats the concealment elements of such

---

[15]  Defendant's interpretation would have the Rule apply no differently if subsection (7)(v) did not exist, effectively expanding the qualifications of (7)(vi). Instead, the specific omission of (7)(v) from (7)(vi)'s safe harbor clarifies the function of concealment elements as independent of the dimensional harbors.

facilities would be considered a "substantial change.") (emphasis added); *see also id.* at ¶¶ 182-187 (discussing various comments on this clause). It did so after significant input from industry as well as local governments, and with apparent understanding of the consequences of the concealment elements clause. It knew how to provide for an exemption for changes that otherwise comply with the Rule's size limits, and did so for certain original conditions of approval, but chose not to for concealment elements.

Whether the Rule interpretation of the Act's simple language is apt of no moment; the FCC is empowered to interpret and enact regulations to execute the Act, and the Defendants have not contested the Rule's validity. As written and explained by the FCC, the Rule excludes from the EFR process changes that would in any way defeat a facility's original concealment elements. It is true that in cases such as this, where the concealment elements include specific height and width limits, that means that the Rule's more general size limits carry no weight, and it also means that Crown Castle is right that no material changes to the physical dimensions of the pole can be made under this expedited, mandatory-approval process. But the FCC appears to have considered that possibility, and apparently with the widespread support of the wireless industry,[16] chose not to permit such changes merely because they complied with the new Rule's size limits as it did for conditions not related to concealment of a facility. The Court recognizes that for the subset of facilities with size-related concealment elements, this may, as Crown Castle argues, frustrate the goal of the Act and the Rule to speed up the

---

[16] *See* 2014 Order at 200 (noting that the blanket exclusion of changes to concealment elements "is widely supported by both wireless industry and municipal commenters.")

process of adding bandwidth and other improvements.[17] To the extent the rule strikes the wrong balance in these cases, however, that is a matter for the FCC or Congress to address. The Court must apply the rule as written, and as written, it excludes Crown Castle's application from the EFR process because it would defeat the specific concealment elements that limit the size of the existing pole to 35 feet high and 18 inches wide.[18]

### D. Whether the County's Actions "Prohibit or Have the Effect of Prohibiting the Provision of Personal Wireless Services"

Crown Castle asserts an independent ground for relief under Section 704 of the Telecommunications Act of 1996 ("TCA"), 47 U.S.C. § 332(c)(7)(B)(i)(II), which states that a locality's regulation of the "placement, construction, and modification of personal wireless services . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services." The Defendants claim that the County has violated this provision of the TCA.

The Tenth Circuit has held that the test for assessing a claim under Section 704 is whether (1) preventing construction of the proposed facilities prevents the cellular provider entity from closing a "significant gap" in existing services, and (2) the proposed facilities were "the least intrusive means" of closing that gap. *AT&T Mobility Servs., LLC v. Village of*

---

[17]  Of course, it reinforces another goal: to "address municipalities' concerns over impacts to aesthetics and other local values." *Id.* at 7.

[18]  Crown Castle has not argued that, if the size limits are concealment elements their proposed changes would somehow not "defeat" them. Indeed, they concede the opposite: "if the exact dimensions of a structure could themselves be concealment elements, then *no* change to the physical dimensions of the structure would qualify as an EFR." Doc. 69 at 5. The Court therefore need not decide here whether some sort of de minimus alteration to a concealment element would still qualify.

*Corrales*, 642 F. App'x 886, 889 (10th Cir. 2016). Although the Defendants cite to an FCC Infrastructure Order suggesting that this significant gap/least intrusive means test is overly rigid, the Tenth Circuit has not adopted that view.

Crown Castle has submitted evidence that there is a "significant gap" in existing services that would be remedied by an expansion of the existing cell tower, and the County does not appear to dispute that evidence. The County does dispute, however, that the Defendants' proposed modification was the least intrusive means of closing the gap. The Court agrees with Judge Neureiter's observation that the County was open to other alternatives for modifying the tower, such as a windmill or silo design, that the Defendants could have pursued but did not. Having chosen to follow the Deemed Grant Letter route rather than the alternative modifications suggested by the County, the Defendants cannot credibly argue that the County prohibited them from providing wireless services.

Thus, setting aside the entirely separate issue of whether the Defendants' proposed modification would have "substantially change[d] the physical dimensions" of the tower, the Court holds that the Defendants are not entitled to summary judgment on their prohibition claim under Section 704 of the TCA.

## III.   CONCLUSION

For the foregoing reasons, the Court **ADOPTS in part and REJECTS in part** the Report and Recommendation (Doc. 86), as modified and explained herein.

The Court **GRANTS** Plaintiff's Summary Judgment Motion (Doc. 62) in part. The Court **DECLARES** that Defendants' proposal is not an eligible facilities request under 47 U.S.C. § 1455(a)(1) and 47 C.F.R. § 1.6100. The Court **DENIES** the remainder of Plaintiff's Summary

Judgment Motion and **DENIES** Defendants' Summary Judgment Motion (Doc. 61). The Clerk of Court is directed to enter declaratory judgment in Plaintiff's favor on Count III of its Complaint (Doc. 1). All other claims and counterclaims are hereby **DISMISSED**.

Dated: January 9, 2020.

BY THE COURT:

_____
Daniel D. Domenico
United States District Judge